RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CONNECTION DISTRIBUTING CO.; RONDEE
KAMINS; JANE DOE; JOHN DOE,
                 *Plaintiffs-Appellants,*

      *v.*

ERIC H. HOLDER, JR., Attorney General,
                *Defendant-Appellee.*

No. 06-3822

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-01993—John M. Manos, District Judge.

Argued: September 10, 2008

Decided and Filed: February 20, 2009

Before: BOGGS, Chief Judge; KENNEDY, MARTIN, BATCHELDER,
DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON,
COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** J. Michael Murray, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland,
Ohio, for Appellants. Jonathan F. Cohn, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellee. **ON BRIEF:** J. Michael Murray, Lorraine R.
Baumgardner, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for
Appellants. Anne Murphy, Thomas M. Bondy, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee.

      SUTTON, J., delivered the opinion of the court, in which BOGGS, C. J.,
BATCHELDER, DAUGHTREY, GILMAN, GIBBONS, ROGERS, COOK, McKEAGUE,
GRIFFIN, and KETHLEDGE, JJ., joined. KENNEDY, J. (pp. 29-54), delivered a separate
dissenting opinion in which MARTIN, MOORE, COLE, CLAY, and WHITE, JJ., joined.
MOORE, J. (pp. 55-63), and CLAY, J. (pp. 64-67), delivered separate dissenting opinions,
in which MARTIN and COLE, JJ., joined. WHITE, J. (pp. 68-72), also delivered a separate
dissenting opinion.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge.   At issue in this case is whether a provision of the Child Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, § 7513, 102 Stat. 4485, 4487 (codified as amended at 18 U.S.C. § 2257), violates (1) the First Amendment's free-speech guarantee, either as applied to the plaintiffs or on its face, or (2) the Fifth Amendment's privilege against self-incrimination.

I.

A.

Prior to 1988, Congress attempted to prevent the exploitation of children through pornography in at least two ways.   It banned all obscene pornography, whether involving children or not.   *See* Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7 (1978) (codified as amended at 18 U.S.C. §§ 2251–2252, 2256). And it banned all other pornography involving children under the age of 18.   *See* Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204 (codified as amended at 18 U.S.C. §§ 2251–2254); Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, 100 Stat. 3510 (codified as amended in various sections of 18 U.S.C.).   No one in this case questions Congress's authority to prevent the exploitation of children in these ways, and indeed the Supreme Court has made it clear that these kinds of regulations represent a permissible means of addressing the problem.   *See New York v. Ferber*, 458 U.S. 747, 756–66 (1982); *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 126, 129–130 (1973); *cf. Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 239 (2002).

In 1986, the Attorney General's Commission on Pornography determined that, although efforts to eradicate child pornography had "drastically curtailed its public presence," they "ha[d] not ended the problem."   *Final Report of the Attorney General's Commission on Pornography* 134 (1986).   While "[s]exual exploitation of children has retreated to the shadows," the Commission observed, "no evidence . . . suggests that children are any less at risk than before."   *Id*.   One lingering problem, the Commission found, was that the pornography industry's proclivity for using youthful-looking models often made it

difficult to discern whether underage models were being used in various publications and movies. *Id.* at 138–39.

Prompted by the Commission's report and recommendations, Congress in 1988 enacted the Child Protection and Obscenity Enforcement Act. *See Am. Library Ass'n v. Barr* (*ALA I*), 956 F.2d 1178, 1182 (D.C. Cir. 1992).  Section 7513(a) of the Act, known by its codified section number as § 2257, attempted to address this problem by adding a reporting and verification requirement to the existing laws designed to prevent child pornography. Under § 2257 of Title 18, those who create materials depicting "actual sexually explicit conduct" must maintain records of their models' ages and identities.  The Act defines "actual sexually explicit conduct," 18 U.S.C. § 2257(a)(1), as "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex," *id.* § 2256(2)(A)(i), as well as bestiality, masturbation, sadistic or masochistic abuse, and the "lascivious exhibition of the genitals or pubic area of any person," *id.* § 2256(2)(A)(ii)–(v); *see id.* § 2257(h)(1).

Under the Act's reporting requirements, a regulated producer must examine, and retain a copy of, each model's or performer's photo identification.  *See id*. § 2257(b); 28 C.F.R. § 75.2.  It must make these records available for inspection by the government upon request.  *See* 18 U.S.C. § 2257(c); *see also* 28 C.F.R. §§ 75.4–.5.  And it must include a statement in its publications noting where the relevant records are kept and who maintains them.  *See* 18 U.S.C. § 2257(e); *see also* 28 C.F.R. § 75.6.

The requirements of the Act together with the implementing regulations apply to "primary" and "secondary" "producers" of sexually explicit images.  Primary producers are those who create a visual representation of actual sexually explicit conduct through videotapes, photographs or computer manipulations.  18 U.S.C. § 2257(h)(2)(A)(i); 28 C.F.R. § 75.1(c)(1).  Secondary producers are (1) those who use such images for "assembling, manufacturing, publishing, duplicating, reproducing, or reissuing" any material containing regulated images, 18 U.S.C. § 2257(h)(2)(A)(ii), and (2) those who upload such images to a website or otherwise manage the content of the website, *id.* § 2257(h)(2)(A)(iii); 28 C.F.R. § 75.1(c)(2).  Primary producers must "create and maintain" records relating to all of the visual depictions they produce, indexed by performer and publication, while a secondary producer may meet its burden by obtaining a copy of the primary producer's

records. 28 C.F.R. § 75.2(a)–(b). In addition, no one may knowingly sell, transfer or offer for sale in interstate commerce materials containing covered images unless they contain the required labels. 18 U.S.C. § 2257(f)(4).

A regulated entity that fails to follow these requirements is subject to criminal penalties. *Id*. § 2257(f). The Act makes it a felony not to comply with these requirements, and a producer convicted of violating the Act may be fined and subject to as many as five years in prison. *Id.* § 2257(i).

Since 1988, Congress has amended § 2257 several times: in 1990, 2003 and 2006. *See* Child Protection Restoration and Penalties Enhancement Act of 1990, Pub. L. No. 101-647, §§ 301(b), 311, 104 Stat. 4816, 4816–17; Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act, Pub. L. No. 108-21, § 511(a), 117 Stat. 650, 684–85 (2003); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 502(a), 120 Stat. 587, 625–26. In addition, the Attorney General has issued implementing regulations on three occasions. *See* 57 Fed. Reg. 15,017 (Apr. 24, 1992); 70 Fed. Reg. 29,607 (May 24, 2005); 73 Fed. Reg. 77,432 (Dec. 18, 2008). With one exception, the main provisions of the Act challenged here—the record-keeping and labeling requirements that apply to depictions of actual sexually explicit conduct, 18 U.S.C. § 2257(a)–(c), (e)—have not materially changed since 1988. The exception is a provision added to the law through the 2003 amendments, which allows law-enforcement officials to use records required by the statute in prosecuting certain other crimes. *See* Pub. L. No. 108-21, § 511(a)(1), 117 Stat. at 684. The other significant changes to the law, not directly challenged here, include: expanding the statute's scope to cover computer-based images, *see id.* § 511(a)(2), 117 Stat. at 685; *see also* Pub. L. No. 109-248, § 502(a)(1), 120 Stat. at 625, and clarifying that the record-keeping and labeling requirements do not reach those who merely provide services related to the images (such as film-processing, distribution and internet-access services), *see* Pub. L. No. 109-248, § 502(a)(4), 120 Stat. at 625–26.

B.

Founded in 1976, Connection Distributing publishes several magazines devoted to "[s]winging," a lifestyle "philosophy that holds that monogamy is incompatible with human nature and that the freedom to share sexual experiences with other like minded couples

strengthens the bond of a couple's relationship." Br. at 14–15. Connection's magazines facilitate swinging by providing a venue for like-minded individuals to share their sexual interests, preferences and availability. *See Connection Distrib. Co. v. Reno* (*Connection I*), 154 F.3d 281, 285 (6th Cir. 1998). Although the magazines contain editorials and feature stories, they principally consist of advertisements—some in text alone but most in text accompanied by photographs. The advertisements serve as a form of uninhibited self-promotion, as they depict the featured individuals in graphic detail, exhibit and discuss the individuals' preferred sexual practices and invite readers to share similar experiences with them. *Id.*; *see also* Br. at 18.

Sometimes the photo advertisements depict individuals' full bodies, including their faces, but 85–90% of the advertisers do not reveal their faces. JA 393. A typical photograph thus portrays either just a featured body part or the full body with the face cropped or blocked out. *Id.*; *see, e.g.*, JA 1021–23, 1027, 1029–30, 1036, 1052, 1075, 1089–90. Individuals do not mention their full names in the advertisements but instead share their names, addresses and phone numbers with Connection. JA 383, 393–94, 397. Some advertisements mention individuals' mailing addresses, *see, e.g.*, JA 1020–23, and others mention access codes that allow readers to respond to the advertisements through Connection, *see, e.g.*, JA 1019, 1163–65, 1171–72, which acts as something of a matchmaker by forwarding written responses to individual advertisements for a fee and by allowing subscribers to use its 900-number service to contact individual advertisers, *see Connection I*, 154 F.3d at 285.

## C.

In 1995, Connection filed a complaint challenging the validity of § 2257 and its implementing regulations on First Amendment grounds. Seeking declaratory and injunctive relief, it claimed that the statute was unconstitutional (1) as applied to Connection and its advertisers and (2) on its face.

The district court denied Connection's motion for a preliminary injunction, and a panel of this court affirmed. Focusing on the likelihood-of-success inquiry, the panel held that the claimants had little prospect of establishing that the statute violated the First Amendment as applied to Connection because the law amounted to a content-neutral

regulation and survived intermediate scrutiny. *Connection I*, 154 F.3d at 284, 288–94, 296. The panel did not address the merits of Connection's facial challenge.

On remand, the district court granted summary judgment against Connection. A panel of this court reversed and remanded, directing the district court to "allow the parties additional discovery" and to "reconsider the matter in light of [four] recent Supreme Court precedent[s]." *Connection Distrib. Co. v. Reno* (*Connection II*), 46 F. App'x 837, 837 (6th Cir. 2002). In asking the district court to reconsider its decision in the light cast by these precedents, the *Connection II* panel held that these intervening decisions did not affect its prior holding that intermediate scrutiny applied to this challenge. *Id.* at 837.

After the *Connection II* panel remanded the case and after Congress amended the statute in 2003, Connection filed an amended complaint and added three new plaintiffs: Rondee Kamins, the publisher of Connection; and Jane and John Doe, two anonymous adults who "wish to publish" in Connection's publications but have "refrain[ed] from doing so for fear of having [their] identit[ies] revealed to the government." JA 32–33. Connection again sought a preliminary injunction, and the government again sought summary judgment. The district court denied the preliminary injunction and granted summary judgment to the government.

## II.

Since Congress enacted § 2257 in 1988, two federal appellate decisions have addressed First Amendment as-applied challenges to the law—one by the D.C. Circuit, *Am. Library Ass'n v. Reno* (*ALA II*), 33 F.3d 78, 87–90 (D.C. Cir. 1994), the other by this court, *Connection I*, 154 F.3d at 288–94. Today's dispute presents a renewal of Connection's as-applied challenge to the law's record-keeping and disclosure provisions and a facial challenge to them. The "usual judicial practice" is to address an as-applied challenge before a facial challenge because it generally will be more "efficien[t]," because this sequencing decreases the odds that facial attacks will be addressed "unnecessarily" and because this approach avoids encouraging "gratuitous wholesale attacks upon state and federal laws." *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989). We thus start by addressing the as-applied challenge.

A.

In renewing its as-applied attack, Connection argues that the Act's record-keeping and disclosure provisions, 18 U.S.C. § 2257(a)–(c), (e), suppress the free expression of Connection and any subscribers who wish to place sexually explicit personal advertisements in its magazines. We disagree—for many of the reasons that *Connection I* denied the company's request for a preliminary injunction in 1998.

*Intermediate scrutiny applies*. In attempting to address the problem of underage pornography, Congress did not *ban* all images of sexually explicit conduct (on the theory that some images would involve minors) or *ban* all images of sexually explicit conduct that appeared to involve minors (on the same theory). Instead of suppressing these categories of expression, Congress chose to regulate the records of those creating and distributing sexually explicit images.

Still, as Connection correctly points out, § 2257's record-keeping requirements do not entirely ignore the content of the producers' images because the requirements apply only to materials that visually depict certain listed acts. *Id*. § 2257(a); *see also id*. § 2256(2)(A). But that reality does not make the law a presumptively invalid content-based regulation of speech so long as the requirements are "*justified* without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted); *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986); *cf. City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434–35, 440–41 (2002) (plurality); *id*. at 448–49 (Kennedy, J., concurring in the judgment). So long in other words as the law addresses the collateral or "secondary effects" of the expression, not the effect the expression itself will have on others, it will be treated as content neutral. *See City of Renton*, 475 U.S. at 47; *Connection I*, 154 F.3d at 291. By contrast, statutes that single out speech for special treatment because of the effect its content will have on its audience amount to content-based restrictions subject to strict scrutiny. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 811–12 (2000).

Gauged by this benchmark, § 2257 is content neutral. *Connection I*, 154 F.3d at 290–91. As Connection concedes, Congress's "unanimous concern" in enacting the provision was to deter the production and distribution of child pornography. Br. at 6.

Congress singled out these types of pornography for regulation not because of their effect on audiences but because doing so was the only way to ensure that its existing ban on child pornography could be meaningfully enforced.  That objective not only is independent of the content of the regulated speech, but it also is a concern of the highest order, one that relates to a category of speech that the government may regulate, indeed completely suppress, based on its content.  *See Ferber*, 458 U.S. at 756–66; *cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–86 (1992).  If Congress may suppress child pornography in its entirety due to its scarring impact on the children exploited in its production, surely it may facilitate the enforcement of laws devoted to that end by imposing a proof-of-age requirement on the producers and distributors of images of sexually explicit conduct—without triggering the most rigorous scrutiny known to constitutional law.  Because the proof-of-age requirement exists in spite of, not because of, the effect Connection's speech will have on its audience and because the required records allow the enforcement of constitutionally sound laws aimed at eradicating the production of child pornography, § 2257 does not amount to a presumptively invalid content-based regulation of speech.  *See Ferber*, 458 U.S. at 756–66.

Nor does the law implicate the central risk of a content-based regulation of speech: that the government has impermissibly interfered with the free exchange of ideas by imposing trade barriers on certain viewpoints but not on others.  *See Ward*, 491 U.S. at 791 ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."); *R.A.V.*, 505 U.S. at 387; *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984).  No doubt, § 2257 favors a particular viewpoint on this issue:  Congress is against child pornography and is using this law to prevent it.  Although that kind of viewpoint discrimination normally would be fatal to a law, that is not true here because the Constitution allows the government to embrace this viewpoint and to act on it by imposing a complete trade barrier on the production and trafficking of this kind of speech.  *See Ferber*, 458 U.S. at 756–66.  What we have, then, is a valid speech-related end—eliminating child pornography—followed by a means of achieving that end, a proof-of-age requirement that refers to the content of the speech (specifically defined images) not because of its effect on the audience but because it is the kind of speech that implicates the government's ban on child pornography.  That kind of sensible reference to the content of speech—how else would the government impose a proof-of-age requirement designed to address child

pornography?—does not rise to the level of a presumptively impermissible content-based regulation of speech.

In addition to *Connection I*, two other federal courts have addressed the level of scrutiny applicable to a free-speech challenge to § 2257. Both share our conclusion that intermediate scrutiny applies. *See ALA II*, 33 F.3d at 85–87; *Free Speech Coal. v. Gonzales*, 406 F. Supp. 2d 1196, 1205–06 (D. Colo. 2005).

*Section 2257 satisfies intermediate scrutiny.* A law satisfies mid-level scrutiny if it advances a "substantial" government interest, if the measure does not "burden substantially more speech than is necessary" and if the measure leaves open "ample alternative channels for communication." *Ward*, 491 U.S. at 791, 799–800 (internal quotation marks omitted); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). No one disputes that the government's interest in protecting children is "substantial." And a universal age-verification requirement advances that interest in a reasonably tailored way for several reasons: It ensures that primary producers of pornography confirm that performers are of age before filming them; it permits secondary producers (who rarely will know the performers) to ensure that the individuals depicted in their publications are of age; it prevents children from attempting to pass themselves off as adults; and it creates a compliance system in which law-enforcement officers not only can identify the performers depicted in magazines and movies and verify their ages but also can eliminate subjective disputes with producers over whether a model's *apparent* age should have triggered an age-verification check. *See ALA II*, 33 F.3d at 86, 88–90; *see also Connection I*, 154 F.3d at 291–92; *Final Report of the Attorney General's Commission on Pornography* 138–39.

In objecting to this conclusion, Connection argues that the record-keeping requirements place undue barriers on the advertisers' interests in engaging in anonymous speech. Yet Connection is not a particularly credible advocate for anonymous speech, as it *does not* permit advertisers to submit photos or other information without identifying who they are. Nothing in the statute, moreover, makes the required records available to the *public. Cf. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166–67 (2002). The advertisers must give the records only to Connection, to whom each advertiser already will have given material that most people would consider deeply personal—sexually explicit pictures of themselves with identifying names and addresses.

Having entrusted Connection with these pictures and having already been required by Connection to disclose their identities, what individuals would shy away from producing verification of their ages as well? None, it seems to us, or at least none who would have a reasonable basis for doing so.

But, Connection adds, § 2257 also makes the information available to the government upon request. To the extent the advertisers are concerned that the law gives the government access to their names, addresses and other identifying information, they have no more to complain about than every taxpayer in the country. To the extent their concern is that the government somehow plans to use this information for a purpose for which it was not intended, say, to target swingers for mistreatment, they offer nothing more than two unverified anecdotes to support the point, and both anecdotes have nothing to do with the improper use of these records by government agents.

That leaves one other risk: that § 2257 undermines a central benefit of Connection's magazines—its creation of a forum for individuals to present sexually explicit pictures of themselves to the world without disclosing who they are. Under § 2257, it is true, the government has access to these images and the identities of the individuals for the limited purpose of ensuring they are of age. But under Connection's business model, so potentially does the rest of the world. The essence of the company's service is to facilitate non-platonic connections between anonymous advertisers and anonymous subscribers, something it does by giving advertisers the opportunity to respond to inquiries they have solicited and by giving advertisers the opportunity to lift the veil of anonymity, to say nothing of other veils, to these unknown inquirers. It may be that there are advertisers in Connection's magazines who have greater privacy concerns about revealing their identities to law-enforcement officers for the limited purpose of confirming their age than about revealing their identities to unknown inquirers for the purpose of facilitating a liaison. But the question is whether such individuals would have a cognizably reasonable basis for suppressing their communications in this setting, and that is something Connection's affidavits and evidence do not support.

Although Connection points out that its *paper* subscriptions have decreased since the passage of the Act in 1988, it fails to account for the possibility, acknowledged by its own expert, that the rise of Connection's internet service, internet-based chat rooms and the like

explain the decline.  According to Connection's editor, the company's own internet-based service went from non-existent in 1995 to doing "fairly well" by 2000.  JA 590.

Connection also contends that a universal age-verification requirement is over-inclusive because it requires Connection to maintain records of individuals who are "in their 30s, 40s, 50s and beyond."  Br. at 34.  A rule requiring photo identification only where the depicted individual appears to be under some threshold age, it argues, would accomplish Congress's goal without burdening free expression that has little likelihood of implicating the underlying concerns of the statute.  But in enacting a content-neutral proof-of-age requirement, Congress need not employ "the least speech-restrictive means of advancing the Government's interests" but must show only that the government's "interest . . . would be achieved less effectively absent the regulation" and that the measure "do[es] not burden substantially more speech than is necessary."  *Turner*, 512 U.S. at 662 (internal quotation marks omitted).

No doubt requiring identification only where the individuals appear to be below a threshold age "would lead to accurate determinations in many cases."  *Connection I*, 154 F.3d at 292.  But it could not do so without injecting "an ineffectual subjectivity" into the proof-of-age requirement and without effectively delegating enforcement of this critical issue to the industry being regulated—two of the problems Congress permissibly sought to correct.  *Id.*; *ALA II,* 33 F.3d at 90 ("The entire point of the Act is to prevent subjective determinations of age by implementing a uniform procedure that applies to all performers.").  The record in this case illustrates the problem.  Although Connection maintains that "a simple look at the photos" in its magazines "makes . . . clear" that the persons pictured are obviously "not minors," Br. at 34, the record proves otherwise.  A brief glance at one of the issues of the magazine included in the record reveals many images (particularly the frequent depiction of mere body parts) from which no lay observer could readily discern the individuals' ages, *see*, *e.g.*, JA 1020, 1022–23, 1025–30, 1034, 1036–38, 1041, 1045, 1052, 1060, 1068–69, 1075–76, 1085, 1089–90, 1092, 1098–1105, as well as a number of images that appear (and in some cases purport) to portray youthful individuals, *see, e.g.*, JA 1027, 1032, 1041, 1052, 1060, 1068–89, 1075, 1089–90.

Connection counters that these images tell just part of the story:  Many of the pictures it receives from would-be advertisers, when combined with other information

submitted, including the advertisement text and payment details, provide enough information for Connection's editors to estimate the advertisers' ages, and the pictures are simply cropped before they appear in one of Connection's magazines. Connection's editor asserts in her affidavit that she has encountered only two cases where the age of the individual depicted was in doubt. Even if we accept all of this as true, it does nothing to diminish the subjectivity inherent in ad hoc, appearance-based judgments based on amateur photographs. Nor does it address the risks of delegating enforcement of this critical issue to the subjects of the regulation or of human error in evaluating submitted advertisements. The editors who screen submitted advertisements, notably, have no particular training in age identification, and the record reflects some instances where the editors approved advertisements that expressly describe persons below Connection's alleged self-imposed age cutoff of 21. *See, e.g.*, JA 380–82, 415–16, 422. Most importantly, however, these arguments do nothing to solve the problem of applying an appearance-based standard to advertisements that contain only isolated body parts. So long as Connection continues to be an advertising forum in which individuals may submit advertising text along with photographs of body parts, it offers no reasonable basis for ensuring that even the most earnest and law-abiding peddler of pornography can verify that its images depict adults rather than minors.

The testimony of the government's expert, Dr. Francis Biro, does not overcome this problem. True, Dr. Biro acknowledged that the "vast majority" of the photographs he examined showed individuals over 21 and "many" in their thirties, forties and fifties. JA 479. True also, it appears that Dr. Biro attempted to estimate the ages of some models based on images of body parts alone, concluding that some models were under 21 but most were not. Yet he stressed that "there's no way of establishing an exact age by looking at an individual" depicted in such images, JA 487, and he noted that determining whether a pictured model is above or below the age of majority is not an "exact science," JA 475, particularly when the picture does not capture enough relevant details. Whatever Dr. Biro can or cannot do in this respect, moreover, matters little to the resolution of this case. Even if it is true that, at least up to certain stages in a person's development, an *expert* sometimes may be able to distinguish between individuals of different ages based on an examination of mere body parts, that does not help Connection. It offers no evidence that its own staff has the capacity to make the same nuanced determinations, and its editor admitted they had no training in the subject at all.

The statute also leaves "ample alternative channels" of communication for Connection's advertisers. Although § 2257 closes one narrow door for Connection advertisers—by prohibiting them from submitting sexually explicit images to its magazines without providing photo identification—it leaves open other doors of communication. Keep in mind that, even before Congress passed the Act, Connection itself prevented its advertisers from making anonymous submissions. It required advertisers then, and it does not mind requiring advertisers now, to provide their names and addresses in connection with all submissions, and it has always said that only adults may make submissions. By requiring Connection to demand a verifiable identification with these submissions, the Act merely ensures that the advertisers are who they say they are—in terms of name, address and age. In this sense, "the Act, by its terms, bans no form of expression." *ALA II*, 33 F.3d at 88; *see Connection I*, 154 F.3d at 294. It simply adds a requirement—a photo identification—that is consistent with Connection's existing identification requirements and that therefore is unlikely to affect many adult advertisers who otherwise wish to share their photographs with Connection and who otherwise are willing to comply with Connection's existing identification and age requirements. Similar record-keeping requirements, indeed, are routinely required to assist the enforcement of tax, employment and immigration laws. *See ALA II*, 33 F.3d at 91. Once these requirements are satisfied, individual advertisers may publish their pictures anonymously to their hearts' content. Even then, moreover, another alternative remains: Connection's internet service provides an independent channel of communication, and the government does not argue that these parts of the Act and regulations reach this service.

*Recent Supreme Court cases do not undermine the holding of Connection I.* Connection insists that much has changed since our court first addressed these issues—that four recent Supreme Court decisions support its position, and that changes to the statute (and the implementing regulations) have impermissibly expanded the statute's reach. We disagree.

In *Free Speech Coalition*, the Court invalidated statutory provisions that criminalized the possession of any image that "appears to be[] of a minor engaging in sexually explicit conduct," 18 U.S.C. § 2256(8)(B) (2000); *see* 535 U.S. at 258. Yet these provisions could not be justified as remedying harms that flow from the production of child pornography

because the images at issue were "produced without using any real children." 535 U.S. at 239. The government instead defended the law on the ground that the speech it singled out was unprotected by the First Amendment precisely *because* of its content. *Id.* at 249, 257. Its asserted rationales—that pedophiles might use such "virtual child pornography" to entice children to participate or might "whet their own sexual appetites with the pornographic images"—each targeted a "harm [that] flows from the content of the images, not from the means of their production." *Id.* at 241–42 (internal quotation marks omitted).

In invalidating the provisions as facially overbroad because they impermissibly abridged a "substantial" amount of protected speech, *id.* at 256, 258, the Court did not expressly say it was applying strict scrutiny to the law. But what it did can only be described as employing the tools of this most skeptical level of review, as it invalidated the provisions because they did not hew closely enough to any of the government's asserted interests in enacting the law. *See id.* at 251–58. Section 2257, by contrast, is content neutral and subject only to intermediate scrutiny. *Free Speech Coalition* did not answer (because it did not confront) the question raised by a content-neutral record-keeping requirement. The proper analogy to this case thus is not a law that criminalizes the possession of images that appear to be child pornography, but a law that requires the producers of apparent child pornography to keep their production records to allow law-enforcement officers to ensure that actual child pornography was not involved. Nothing in *Free Speech Coalition* suggests that such a law would be invalid.

At issue in *Watchtower* was an ordinance that required door-to-door canvassers and pamphleteers to register with the government in advance of their activities. *See* 536 U.S. at 154–58. In concluding that the law failed intermediate scrutiny, the Court reasoned that it affected a broad spectrum of speech, hindered an historically significant mode of communication and destroyed anonymous and spontaneous advocacy by making the registration records open to the public at large. *See id.* at 162, 165–69. Section 2257, however, does none of these things: It affects only a narrow category of speech and does so for the limited purpose of preventing speech (child pornography) that the First Amendment does not protect; it does not condition speech on announcing to the public at large what the speaker plans to say or why he plans to say it; and it does so in a setting in which the

publisher of these advertisements already required the individuals to disclose their identities, *see ALA II*, 33 F.3d at 94.

*Alameda Books* and *Playboy Entertainment* support the application of intermediate scrutiny to this case and support the distinction that *Connection I* drew (and we draw today) between restrictions that are justified without reference to the content of the regulated speech and those that are not. *Compare Alameda Books*, 535 U.S. at 440–41 (plurality), *and id.* at 448–49 (Kennedy, J., concurring in the judgment), *with Playboy Entm't*, 529 U.S. at 811–12. *Alameda Books* also supports *Connection I* for a separate reason: It emphasizes the deference that courts owe to legislative judgments about the collateral effects of speech. *See* 535 U.S. at 437–40 (plurality); *id.* at 449 (Kennedy, J., concurring in the judgment).

Nor do any of the changes to § 2257 or its implementing regulations enhance Connection's as-applied challenge. Although Connection does not directly challenge any of the 2006 amendments to the law, it does challenge (or at least rely upon) two of the 2003 amendments. One of those amendments enlarged the list of offenses for which the government may use the records required by § 2257 as evidence, most notably by allowing the records to be used in prosecuting child-pornography, sexual-exploitation-of-children and obscenity offenses. *See* Pub. L. No. 108-21, § 511(a)(1), 117 Stat. at 684 (amending 18 U.S.C. § 2257(d)(2)). While this amendment to the law supplies the basis for plaintiffs' Fifth Amendment challenge (more on that below), it has no real bearing on Connection's First Amendment claim. If "criminal penalties for obscenity offenses are consistent with the First Amendment," even though they may deter some amount of non-obscene expression, *Alexander v. United States*, 509 U.S. 544, 557 (1993), individuals may not prevent the government from using records of *actually* obscene expression in an otherwise-lawful obscenity prosecution.

The other statutory change made by the 2003 amendments extends § 2257 to internet and other computer-based images. *See* Pub. L. No. 108-21, § 511(a)(2), 117 Stat. at 685 (amending 18 U.S.C. § 2257(h)(3), recodified at *id.* § 2257(a)). But that alteration, too, makes no difference here. Connection itself maintains that this change to § 2257 is "not self-executing" and is effective only to the extent implemented by the revised regulations. Reply Br. at 10 n.2. And as it acknowledges, the district court held that Connection's online

activities are exempt under the regulations themselves, a conclusion the government has declined to challenge on appeal, *see* Br. at 19 n.6.

In dissent, Judge Moore maintains that strict scrutiny should govern this as-applied challenge. Yet at no point in its panel brief or in its supplemental en banc brief did Connection urge us to apply strict scrutiny to this case, and, with respect, the reasons given in *Connection I* by a panel of this court, in *ALA II* by the D.C. Circuit and in today's opinion justify continuing to apply mid-level scrutiny to this dispute. Judge Moore also maintains that, even if intermediate scrutiny applies, § 2257 should be invalidated, and in doing so she makes a convincing case why the law would have difficulty withstanding an as-applied attack by a mature-adults-only magazine that included photographs only of readily identifiable mature adults. But, with respect, that is not this case, and it is not Connection's publications. By allowing photographs of individuals who appear to be, and in some cases purport to be, youthful and by allowing photographs of body parts alone, Connection simply is not a standard-bearer for the mature-adults-only publication. It thus cannot be the beneficiary of the First Amendment difficulties such a claim would present.

### B.

That brings us to Connection's facial challenge to the Act. A facial challenge to a law is no small matter. At stake is not an attempt to invalidate the law in a discrete setting but an effort "to leave nothing standing," *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc), to invalidate the law in each of its applications, to take the law off the books completely. That, to be sure, is the fate some laws deserve—either because the defect in the law infects all or virtually all of its applications (say, a race-based classification or a law serving an unconstitutional purpose) or because the constitutional problems cannot meaningfully be severed. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 585–594 (1987); *City of Houston v. Hill*, 482 U.S. 451, 468–69 (1987); *see also* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 279–82 (1994). But before the courts will announce such a judgment, they generally insist that the claimant show one of two things: (1) that there truly are "no" or at least few "circumstances" in "which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Wash. State Grange v. Wash. State Republican Party*, __U.S.__, 128 S. Ct. 1184, 1190 (2008); or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its

unconstitutional applications. To do otherwise would amount to a judicial trespass—a court's striking of a law in all of its applications even though the legislature has the prerogative and presumed objective to regulate some of them.

This rule normally would make short work of the plaintiffs' facial challenge. Our court's rejection of the as-applied challenges to § 2257 in *Connection I* and today, to say nothing of the D.C. Circuit's rejection of a more far-reaching challenge to the law in *ALA II*, demonstrate that the law has numerous constitutional applications—a conclusion that normally would end the matter. In conventional constitutional litigation, it rarely (if ever) will be the case that a court, having upheld the constitutionality of a law in the context of the as-applied challenge before it, will proceed to strike the law in all of its applications based on hypothetical applications of the law to hypothetical individuals not before the court.

But the courts rightly lighten this load in the context of free-speech challenges to the facial validity of a law. Although "[l]itigation by hypothetical" generally is frowned upon, if not barred, in other areas of constitutional litigation, *see Warshak*, 532 F.3d at 529, it is sometimes *required* in free-speech cases. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973); *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38–39 (1999); *cf. Fox*, 492 U.S. at 483–84. Here, for example, even though § 2257 may be applied constitutionally to Connection and the individual plaintiffs, the whole point of a facial challenge, or what the courts in the First Amendment context have come to call an overbreadth challenge, is to permit the claimant to strike the law in its entirety based on its application to other individuals not before the court. The overbreadth doctrine thus changes the customary rules of constitutional litigation: It relaxes the general prohibition against vicarious litigation by allowing claimants to assert the rights of third parties, and it permits a court to strike a law in its entirety even though it legitimately may be enforced in some other settings. *Broadrick*, 413 U.S. at 612–13. Due to the risk that "enforcement of an overbroad law" may "deter[] people from engaging in constitutionally protected speech" and may "inhibit[] the free exchange of ideas," the courts will strike a law on its face "if it prohibits a substantial amount of protected speech" both "in an absolute sense" and "relative to the statute's plainly legitimate sweep." *United States v. Williams*, __ U.S. __, 128 S. Ct. 1830, 1838 (2008); *see also Broadrick*, 413 U.S. at 615.

Even in free-speech cases, however, facial invalidation of a statute remains "strong medicine that is not to be casually employed." *Williams*, 128 S. Ct. at 1838 (internal quotation marks omitted). And even in this setting, facial challenges remain "disfavored" because they frequently require courts to "anticipate a question of constitutional law in advance of the necessity of deciding it" or to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange*, 128 S. Ct. at 1191 (internal quotation marks omitted); *see also id.* ("[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."). The Supreme Court therefore has "vigorously enforced the requirement that a statute's overbreadth be *substantial* . . . relative to the statute's plainly legitimate sweep," *Williams*, 128 S. Ct. at 1838, and has placed "the burden of demonstrating . . . substantial overbreadth" on the claimant, *Virginia v. Hicks*, 539 U.S. 113, 122 (2003); *see also N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its [facial-overbreadth] challenge, [the plaintiff] must demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.").

In attempting to strike § 2257 in its entirety on overbreadth grounds, Connection argues that the law would be unconstitutional as applied to a magazine that depicted only "mature adult models," Supp. Br. at 3, who "are clearly and visibly not minors," Br. at 44. That may well be true, particularly if the magazine not only confined itself to self-evidently mature models but also did not permit the depiction of isolated body parts. The D.C. Circuit reached a similar conclusion, "agree[ing] with [plaintiffs'] suggestions that certain applications of the record-keeping requirements may well exceed constitutional bounds," noting that "an illustrated sex manual for the elderly" would be "an obvious example." *ALA II*, 33 F.3d at 90.

Even so, this argument does not supply a basis for invalidating § 2257. Connection has not pointed us to any such magazine or book and has not introduced any evidence showing that this third-party situation even exists. That alone is reason enough to give us pause. But even if we accepted Connection's submission, even if we assumed in other words that such magazines and books exist and that § 2257 could not validly be applied to them, that would not satisfy the company's burden for dispensing the "strong medicine" of

overbreadth.  At this point in the case, there is little basis for dispute that § 2257 complies with the First Amendment in most settings.  As we have shown, it is constitutional as applied to Connection and the individual plaintiffs, and Connection does not dispute, and indeed all but concedes, that the law would be constitutional in most other settings.  In its panel brief, Connection notes that "the congressional record arguably supports legislation" that targets "sexually explicit depictions of young looking persons," Br. at 33, and it has suggested that the law would be constitutional if it applied only to people who appear to be under 26 or under 30, *Connection Distrib. v. Keisler* (*Connection III*), 505 F.3d 545, 571–72 & n.6 (6th Cir. 2007) (Moore, J., concurring).

Nor does Connection dispute that this "legitimate sweep" of the law represents the vast majority of its applications.  The report of the Attorney General's Commission on Pornography notes that "[p]erhaps the single most common feature of models is their relative, and in the vast majority of cases, absolute youth."  *Final Report of the Attorney General's Commission on Pornography* 229.  At a Senate Judiciary Committee hearing on § 2257 and related legislation, an administrator from the Department of Justice National Obscenity Enforcement Unit testified that "[o]ne who is 25 to 30 years of age is virtually never seen in pornographic videos or magazines." JA 120.  Nothing in the record contradicts these statements or the general notion that, when people buy or share pornography, they typically do so with respect to publications or movies involving the young.

Far from contradicting these aspects of the legislative record, Connection elaborates on them, explaining that "the crux of the problem that Congress sought to address was rooted in the fact that commercial producers of sexually explicit films used youthful looking actors and actresses as young as eighteen years old and *nearly always younger than twenty five years old*." Br. at 8 (emphasis added).  A central theme in Connection's fourteen-year attack on this law, indeed, is that its magazine and subscribers are unconventional—that they are "unorthodox" and "controversial" conveyors and purveyors of pornography, that swingers generally are middle-aged individuals and that their advertisements accordingly represent a "minority" of the models and performers generally featured in the materials produced by the pornography industry.  Supp. Br. at 7–8, 24; Br. at 16–17.

On this record and in the face of these concessions, we have no basis for reaching any conclusion other than this: § 2257 most conspicuously applies to publications involving

youthful-looking models and performers, which is the setting in which it is easiest to accept the constitutionality of these proof-of-age requirements and which at any rate is the setting in which the plaintiffs *do not* challenge the law's validity. Connection at most has identified a discrete application of the statute that may be problematic. Yet the question is not whether the claimant can imagine some "overbreadth"; it is whether the claimant can show "substantial overbreadth."

At the panel stage of this case, the judges on their own initiative raised a second overbreadth problem, one not raised in Connection's amended complaint, in its briefs before the district court or in its briefs before the panel. By its terms, the panel observed, the statute seems to apply to a couple who produced, but never distributed, a home video or photograph of themselves engaging in sexually explicit conduct, because the record-keeping requirements apply to anyone who produces sexually explicit images, *see* 18 U.S.C. § 2257(a)–(b), regardless of whether the images are sold, traded, or otherwise distributed, *see id.* § 2257(h)(2)(A)(i)–(iii); *Connection III*, 505 F.3d at 552.

Invoking the constitutional-avoidance doctrine and the rule of lenity, the government points to language in the statute suggesting that it does not cover this situation. Supp. Br. at 20 (noting the statute's references to a producer's "business premises," to the involvement of multiple performers and to contractual or similar relationships between producers and performers). The avoidance doctrine no doubt often goes a long way in defusing potential conflicts between Congress's enactments and the Constitution. Whether the doctrine allows us to read the statutory text in the way the government proposes, however, is far from clear. Viewed in isolation, the Act's reference to "business premises" might suggest that the statute draws a line between commercial and non-commercial pornography. Yet subsequent amendments to the law, apparently in response to a Tenth Circuit decision addressing a related point, *Sundance Assocs., Inc. v. Reno*, 139 F.3d 804 (10th Cir. 1998), make it clear that the law covers commercial *and* non-commercial pornography. *See* 18 U.S.C. § 2257(h)(2)(A), (h)(2)(B)(iii). Peddlers of child pornography, it turns out, are as apt to do so for non-pecuniary purposes as for other motives, which is why Congress extended the law to this setting. *Final Report of the Attorney General's Commission on Pornography* 134–35.

Once we eliminate the possibility of a commercial/non-commercial line of coverage, that leaves at least two other possibilities that would exclude coverage in this setting. One

is that the statute applies only to pornography created for sale or trade, an interpretation that would not apply to pornography created by an adult couple for home consumption. In his appellate briefs in this case and in the preamble to a recently promulgated rule amending the regulations implementing § 2257, the Attorney General has embraced this view, construing the statute as "limited to pornography intended for sale or trade," 73 Fed. Reg. at 77,456. But in view of the terms of the statute, *see* 18 U.S.C. § 2257(a), (b), (h)(2)(A), (h)(2)(B)(iii), the existence of a textual hook for this interpretation is open to question. The other possibility is that, even if the law applied to such a couple, it would rarely matter because most (if not all) of the identifying and record-keeping information required by the Act necessarily would lie within the four corners of the couple's home, which is where the law requires it to be kept. *See Id.* § 2257(c). But in view of the labeling requirements of the implementing regulations, 28 C.F.R. § 75.6(b), it remains unclear whether such a couple would satisfy these requirements without knowing they were doing so.

Given these complexities and given the absence thus far of any such application of the statute, we see no need to resolve the point one way or another, and thus we do not take a stand on the issue. Let us instead assume for the sake of argument that the panel was right—that the law's record-keeping and disclosure requirements would apply to sexually explicit images produced by such a couple. And let us assume for the sake of argument that the panel was right in concluding that this application of the law would be unconstitutional. Does it follow that the panel was also correct in holding that this as-applied defect requires the invalidation of § 2257 in its entirety? Not in our view.

First, we have no record, and therefore no context, for assessing the *substantiality* of this overbreadth problem. Because the plaintiffs did not raise this theory of unconstitutionality in their complaint or in the district court, the record is utterly barren about whether some, many, indeed any, American couples are affected by this proposed application of the statute—and, if so, in what ways. That contextual vacuum by itself counsels in favor of choosing discretion over valor in dealing with this overbreadth challenge. *See N.Y. State Club Ass'n*, 487 U.S. at 14 (rejecting First Amendment overbreadth challenge to local antidiscrimination law, which the plaintiffs asserted could not constitutionally apply to purely private clubs, where "[n]o record was made" concerning those clubs, the Court was "not informed of the characteristics of any particular clubs" and

thus it "[could ]not conclude that the [l]aw threatens to undermine the associational or expressive purposes of any club, let alone a substantial number of them").

But that is just half of the problem. The record not only presents a contextual vacuum; it also presents a law-enforcement vacuum, making this debate all the more abstract and all the more vulnerable to inaccurate rather than accurate judicial decision-making. The government has informed us that, during the twenty years that § 2257 has been in existence, it has never been enforced in this setting. It has informed us that it has no intention of enforcing the law in this setting—as proved by the fact that the Attorney General, a *party* to this case and the sole defendant in it, has taken the position that the statute "does not apply to images that an adult couple produces of its own intimate activity for the couple's private enjoyment at home." Supp. Br. at 20. And it has informed us that, in connection with the promulgation of a final rule amending the regulations implementing § 2257, the Attorney General has stated in the preamble to the new regulations that "[t]he statute . . . is limited to pornography intended for sale or trade." 73 Fed. Reg. at 77,456.

Connection offers no evidence of a contrary enforcement record, and we are not aware of any case law, regulations, even news reports, mentioning the possibility of a different application of the statute—at least until the panel raised the idea during the third appeal of this case. Sure enough, there may be a first time for everything. And we do not mean to suggest that a couple potentially affected by this hypothetical application of the law could not bring a declaratory-judgment action or an as-applied challenge to the law today, whether in their own names or as an anonymous John and Jane Doe. But that does not mean *litigation by proxy* makes sense in this setting, one that has yet to come to pass, one that may never come to pass and one that presents *three* layers of abstraction: (1) no record of any kind about this form of middle-aged sexual expression; (2) no record of its prevalence; and (3) no idea how a government that for twenty years has not applied the law in this setting, that indeed disclaims the authority to apply the law in this setting, ultimately would choose to apply the law if it ever changed its mind. Overbreadth plays several essential roles in protecting free speech, but this simply is not one of them.

Second, this hypothetical application of the statute, even when it is considered on this thin record, makes no difference to the outcome of this case. Even if we assume that the statute covers such a video and even if we assume that the First Amendment would not

permit Congress to impose its record-keeping requirements in this unusual setting, that would not materially advance Connection's efforts to show *substantial* overbreadth. What makes this hypothetical seemingly helpful to Connection—the extension of the statute to a setting that is far removed from the underlying purposes of the Act, that makes little sense and that raises constitutional red flags—undermines much of its significance. Connection offers no argument, much less proof, that there are a meaningful number of individuals who would be adversely affected by this construction of the law. Which takes us back to the central point: The question in the context of a facial challenge is not whether a court can conceive of one or more unconstitutional applications of a statute; it is whether the alleged unconstitutional sweep of the statute is "*substantial* . . . relative to the statute's plainly legitimate sweep." *Williams*, 128 S. Ct. at 1838. No such showing has been made here. The record and the plaintiffs' concessions establish that the overwhelming majority of applications of § 2257 do not offend the free-speech guarantees of the Constitution, and a "vigorous" enforcement of the "substantial overbreadth" requirement prohibits a party from leveraging a few alleged unconstitutional applications of the statute into a ruling invalidating the law in all of its applications. Because the *burden rests with Connection* to establish substantial overbreadth, *see Hicks*, 539 U.S. at 122; *N.Y. State Club Ass'n*, 487 U.S. at 14, and because Connection has produced no evidence on this score, it simply has not supplied a basis for knocking § 2257 out in its entirety.

The concept of "substantial overbreadth," we acknowledge, has some elusive qualities, and it likely is the key source of our disagreements in this case. A first run at applying the Supreme Court's cases in this area might suggest a more concrete approach than we have offered—of placing, say, the number of overall applications of the statute in the denominator and the number of unconstitutional applications of the statute in the numerator. With this ratio in hand, we could identify a certain threshold of unconstitutional applications—of, say 10%, 25%, 50% or more—and label that threshold as the turning point for a finding of substantial overbreadth.

But the Supreme Court has never gone down this road—and with good reason. Substantial overbreadth involves not just an inquiry into the legitimate and illegitimate sweep of a statute; it also involves an inquiry into the "absolute" nature of a law's suppression of speech. Together, these questions require as much in the way of judgment

as they do a comparison between the constitutional and unconstitutional applications of a law. Ultimately, the critical question is this: Under what circumstances is it appropriate to invalidate a law in all of its applications when its invalidity can be shown (or assumed) in just some of its applications? When we think about the problem that way, it is hard to understand who is being hurt by resisting the plaintiffs' call to invalidate the statute on its face. The middle-aged couple is not likely to be chilled by the statute. Over twenty years and numerous administrations, the statute has never been enforced in this setting, and the Attorney General has publicly taken the position that he will not enforce the statute in this setting. But even if this track record does not suffice to give the hypothetical couple peace of mind, they have a remedy—a John and Jane Doe as-applied challenge to the law, together with attorney fees if they win. What, then, of the hypothetical pornography magazine or sex manual that involves only the middle-aged and the elderly? There, too, we have not been told of any enforcement efforts in this area, and *ALA II* and today's case offer ample indications that such an application of the law would run into serious First Amendment problems.

On the other side of the equation, we are being asked to invalidate a law in its entirety based on a worst-case scenario that, to our knowledge, has never occurred, that may never come to pass and that has not been shown to involve a materially significant number of people. How strange, moreover, that we would impose such a remedy *after* the government has withstood every as-applied First Amendment challenge to the law by the real people and businesses to whom it most naturally has been applied over the last twenty years.

Judge Kennedy's dissent notes, correctly, that there are costs to requiring case-by-case adjudication: Some individuals who are wrongfully chilled from speaking may decline to seek redress because litigation is time-consuming and, if they lose, it can be expensive. *See Hicks*, 539 U.S. at 119. But there are serious costs to the alternative, too. Because courts are ill-equipped to "resolve questions of constitutionality" in "every conceivable situation which might possibly arise," *Gonzales v. Carhart*, __ U.S. __, 127 S. Ct. 1610, 1639 (2007), we risk deciding *wrongly* if we answer abstract questions without a proper factual record and with only our judicial imagination to guide us. *See United States v. Raines*, 362 U.S. 17, 22 (1960). And sustaining even a meritorious facial challenge to "a law

that in some of its applications is perfectly constitutional . . . has obvious harmful effects" because it throws out the bad with the good, including what we and all of the parties agree is a perfectly legitimate effort to prevent child pornography when applied to publications and films involving youthful-looking models. *Williams*, 128 S. Ct. at 1838. These costs help to explain why "[a]s-applied challenges are the basic building blocks of constitutional adjudication." *Carhart*, 127 S. Ct. at 1639 (quotation marks omitted) (alteration in original). So long as overbreadth remains "strong medicine that is not to be casually employed," *Williams*, 128 S. Ct. at 1838 (internal quotation marks omitted), and remains a measure only of "last resort," *Broadrick*, 413 U.S. at 613, it has no application here.

Judge Kennedy's dissent notes, correctly again, that the absence of a prior application of the law to private couples who create and keep sexually explicit images in their homes does not by itself doom this facial-overbreadth challenge. A litigant interested in bringing an overbreadth challenge to a law need not await its application to every conceivable fact pattern before filing suit. But that does not mean the government's track record *in this case*—of never applying the law in this setting over twenty years and of disclaiming any authority and intention of doing so—has no role to play in the exercise of our *judgment* about whether to strike this law in its entirety. That enforcement vacuum together with the absence of any record support for the plaintiffs' position contribute to the utterly abstract nature of this debate, surely something we may consider in deciding whether to grant overbreadth relief. And in exercising that judgment, the Supreme Court tells us to consider whether the alleged overbreadth is "substantial" and "real," *Broadrick*, 413 U.S. at 615, the whole point being to determine whether "there [is] a realistic danger that the statute itself will significantly compromise" the First Amendment rights of the parties not before us, such as the hypothesized private couples, *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Surely one factor to consider in assessing the "realistic danger" of inhibiting speech, but hardly the only factor to consider, is the past practices and future prospects of enforcement. *See, e.g.*, *Regan v. Time, Inc.*, 468 U.S. 641, 651–52 & n.8 (1984) (plurality opinion); *Faustin v. City & County of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1368 (10th Cir. 2000).

One other point deserves mention.  At the panel stage, the court reasoned that, once it had identified one unconstitutional application of the law (here to the hypothetical couple), it must invalidate the entire statute unless it could sever an offending portion of the *text* from the rest of the statute.  That is one option when a constitutional problem has been identified, but it is not the only option.  A court may enjoin the unconstitutional *applications* of the law while preserving the other valid applications of the law.  *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504–05 (1985); *United States v. Grace*, 461 U.S. 171, 180–83 (1983); *see also Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29, 332 (2006); *cf.* Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 884–87 (2005).  Or a court may assume for the sake of argument that certain applications of the law would be unconstitutional but still reject a facial challenge.  *See Hicks*, 539 U.S. at 122–24; *N.Y. State Club Ass'n*, 487 U.S. at 14–15; *Ferber*, 458 U.S. at 773–74; *Broadrick*, 413 U.S. at 617–18; *cf. Carhart*, 127 S. Ct. at 1639.  That last path is the one we have followed here.

### III.

In their amended complaint, the three individual plaintiffs challenge the validity of § 2257 under the Fifth Amendment's Self-Incrimination Clause.  As amended in 2003, the statute allows the government to use the records Connection must maintain as evidence not only of violations of § 2257 but also as evidence to prove violations of other obscenity and pornography-related laws.  *See* 18 U.S.C. § 2257(d)(2).  Because these records could implicate them in crimes, plaintiffs argue that this provision violates their privilege against self-incrimination.  The district court rejected this argument on the merits, concluding that two of the three factors we consider in evaluating a self-incrimination challenge to record-keeping requirements cut against the plaintiffs:  The statute's primary purpose is regulatory—as it encompasses largely lawful activity, not a "highly selective and inherently suspect group of people"—and "merely fulfilling the records requirements does not demonstrate involvement in criminal activity."  JA 60–62 (internal quotation marks omitted); *cf. United States v. Alkhafaji*, 754 F.2d 641, 643 (6th Cir. 1985).

We need not resolve the merits of the plaintiffs' self-incrimination claim, however, because it is not ripe.  The ripeness doctrine, we have recently explained, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction" and "serves to avoid[] . . . premature adjudication of legal questions,"

thus "prevent[ing] courts from entangling themselves in abstract debates that may turn out differently in different settings." *Warshak*, 532 F.3d at 525 (internal quotation marks omitted) (omission and first alteration in original). To meet their burden of showing their claim is ripe for review, *see Renne v. Geary*, 501 U.S. 312, 316 (1991), the plaintiffs must show (1) that "the claim [is] fit . . . for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass" and (2) that "the hardship [to them] of withholding court consideration" outweighs the costs of allowing "litigation by hypothetical," *Warshak,* 532 F.3d at 525, 529 (omission in original).

The plaintiffs fall short on both fronts. As for fitness, the Supreme Court has previously held that a pre-enforcement self-incrimination challenge to a reporting requirement is "premature" even when the plaintiff insists that he "intend[s] to engage" in the conduct that triggers the requirement—so long as the plaintiff has yet to assert a privilege claim in response to a government demand for disclosure. *Cal. Bankers Ass'n v. Schultz*, 416 U.S. 21, 72–74 (1974); *see also Trs. for Alaska v. EPA*, 749 F.2d 549, 560 (9th Cir. 1984) (dismissing as "unripe" a pre-enforcement self-incrimination challenge to self-monitoring, reporting and record-keeping requirements contained in federal pollutant-discharge permits where no one contended those requirements had been "improperly applied in an actual case"). That is precisely the case here. As the record now stands, we simply "have no idea whether or when" the Attorney General will attempt to inspect any of Connection's records, let alone refuse to respect a proper claim of privilege. *Warshak*, 532 F.3d at 526 (internal quotation marks omitted); *cf. Free Speech Coal. v. Gonzales*, 483 F. Supp. 2d 1069, 1081 (D. Colo. 2007) (dismissing on standing grounds the plaintiffs' self-incrimination attack on § 2257 because they failed to show a concrete injury, as they "ha[d] not produced any evidence that they have ever been subjected to an inspection").

As for hardship, the plaintiffs have not shown that "withholding court consideration" until a concrete conflict arises will prejudice them in any material way. They do not face the kind of dilemma that confronted the petitioners in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70 (1965). There, after unsuccessfully asserting their self-incrimination privilege to the relevant government agency, the individuals were forced to make a winless choice between complying with the registration requirements "without a [judicial] decision on the merits of their privilege claims" or declining to do so and "risk[ing] onerous and

rapidly mounting penalties while awaiting the Government's pleasure whether to initiate a prosecution against them." *Id.* at 75–76.  At least until the Attorney General attempts to obtain § 2257 records from these individuals, they face no greater risk of prospective harm than a claimant concerned that the government will violate his Fourth Amendment rights in future searches.  *Cf. Warshak*, 532 F.3d at 533.  At this point, their Fifth Amendment claim simply is not ripe.

## IV.

For these reasons, we affirm the district court's order granting summary judgment to the government.

———————————

## DISSENT

———————————

KENNEDY, Circuit Judge, dissenting. Enforcement has never been the touchstone of the substantiality of overbreadth inquiry.[1] On the contrary, the Supreme Court understands the "danger[]" inherent in the possibility that "the legislature could set a net large enough to catch all possible offenders and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987) (quoting *United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876)). A very purpose of the overbreadth doctrine is to invalidate those laws whose statutory language gives such sweep that law enforcement can selectively enforce the law on the basis of the speech's content.[2] *See Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970) (holding a statute unconstitutional on its face because it "vests local law enforcement officers with too much arbitrary discretion[,] . . . permit[ting] only that expression which local officials will tolerate" as a result of the overbreadth of its statutory language, "render[ing] the statute unconstitutional"). To uphold a law based on the statement of an Assistant United States Attorney in this case, Maj. Op. at 22, while at the same time all but conceding that the law is unconstitutional as applied to private couples,[3] Maj. Op. at 24, and that the law's record-keeping application to private couples with its criminal penalty falls within the

———————————

[1] I focus on the overbreadth challenge because the added plaintiffs, the Does, are those who refrained from speaking, Maj. Op. at 6, and the full extent of the case presented to us is not only Connection's claim but the claims of the Does and other private couples producing and keeping sexually explicit images in their own homes. Section 2257 criminalizes the private production of sexually explicit images if a contemporaneous record is not made, which is a prerequisite to the Does' claims that they cannot publish the images they have created in Connection. The Does' claims implicate two forms of speech here: creation of sexually explicit images and their publication.

[2] The Supreme Court has held that sexually explicit images of adults constitute speech and are protected under the First Amendment freedom of speech guarantee. *See Kaplan v. California*, 413 U.S. 115, 119 (1973).

[3] "Private couples" are those adults creating and keeping sexually explicit images in their own homes. *See* Maj. Op. at 20. The statute makes it a crime even for private couples to produce sexually explicit images without first compiling records, affixing statements, and then subsequently maintaining such records for at least five years with law enforcement being able to enter the home at least once every four months to inspect the records. The punishment under § 2257 provides for imprisonment for up to five years and fines.

statute's text, Maj. Op. at 20-21, is to eviscerate the purpose for overbreadth. *See Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 857 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) (Sloviter, J.) (rejecting the "troubl[ing]" argument that "the First Amendment should [] be interpreted to require [the court] to entrust the protection it affords to the judgment of prosecutors" when "[p]rosecutors come and go" but "[t]he First Amendment remains to give protection to future generations"). As a matter of pure logic, overbreadth exists to limit the enforcement capabilities of the Attorney General, and therefore overbreadth's application cannot be limited by an Assistant United States Attorney's or even an Attorney General's professed scope of enforcement.

Keep in mind that overbreadth exists in the First Amendment context as an exception to the normal rules of standing, allowing parties before the court to argue on behalf of those not present. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349-50 (6th Cir. 2007). However, this exception to standing only amounts to "an exception to the usual prudential standing requirement 'that a party may assert only a violation of its own rights,'" *id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988)), not an exception to the constitutional standing requirements prescribed by Article III § 2, *id.* (citing *Am. Booksellers Ass'n*, 484 U.S. at 392-93). No one challenges Connection's prudential or constitutional standing to challenge § 2257 in its entirety. *Cf. Prime Media, Inc.*, 485 F.3d at 350 (requiring the party before the court to have an injury in fact with respect to all of the challenged provisions of a statute).

Many courts have rejected the argument that lack of enforcement means no injury-in-fact in the context of first-party standing. "[O]nly when litigants seek pre-enforcement review of antiquated laws of purely 'historical curiosity'" can the threat of prosecution be deemed speculative. *Navegar, Inc. v. United States*, 103 F.3d 994, 1000 (D.C. Cir. 1997) (quoting *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986)). And yet, even though in *Epperson v. Arkansas*, 393 U.S. 97, 101-02 (1968), the plaintiff had not been charged, "no record of any prosecutions in Arkansas" under the Arkansas statute existed, and the statute was no more than a "curiosity," the Court still held that the plaintiffs had standing to bring a First Amendment freedom of religion challenge. Similarly, the Court held that physicians had standing to challenge a state's abortion

statutes even though "the record [did] not disclose that any one of them [had] been prosecuted, or threatened with prosecution." *Doe v. Bolton*, 410 U.S. 179, 188 (1973). The Sixth Circuit has held that the statutory language itself, where the plaintiff falls within its purview such that the plaintiff "would be subject to application of the statute," in and of itself supplies "the fear of prosecution [] reasonably founded in fact." *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987). The majority does not contest § 2257's application to the private couple on the statute's plain face. Maj. Op. at 20-21.

Connection as the plaintiff provides the uncontroverted injury-in-fact that allows the case to be heard. Connection's injury-in-fact allows it to stand before the court, but it is the chilling effect on the private couple, the "deficiency which may not affect [the litigant] but only others," which allows Connection to challenge a law on overbreadth grounds on behalf of the private couple, *Morrison v. Bd. of Educ.*, 521 F.3d 602, 610 (6th Cir. 2008) (quoting *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1379 (D.C. Cir. 1984)). Indeed, third-party standing for overbreadth challenges exists solely out of concern for a challenged law's chilling effect, so that where there is no chilling of parties not before the court, there is no third-party standing to assert the rights of those parties. *See Pitt News v. Fisher*, 215 F.3d 354, 364 (3d Cir. 2000) ("The Supreme Court has recognized that, in certain cases, the risk that a third party's free speech may be 'chilled' by an overbroad statute or ordinance may warrant the grant of [third-party] standing . . . .") (quoting *Harris v. Evans*, 20 F.3d 1118, 1122 n.5 (11th Cir. 1994), *cert. denied*, 513 U.S. 1045 (1994)).

While the likelihood of prosecution is the appropriate inquiry under the imminence prong of injury-in-fact, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), under the proper inquiry of chilling effect, we must not only look at the possibility of enforcement but also its severity, an important point which the majority does not address. Section 2257 imposes criminal sanctions on speech, making a violation of the statute a felony, which magnifies its chilling effect. *Cf. Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 667 (2004) (where a statute "does not condemn as criminal any category of speech[,] . . . the potential chilling effect is eliminated, or at

least much diminished"). Again, the majority does not contest § 2257's application to the private adult couple on the statute's plain face. Maj. Op. at 20-21. "[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975)). No doubt "a law imposing criminal penalties on protected speech is a stark example of speech suppression" such that "even minor punishments can chill protected speech." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) (citing *Wooley v. Maynard*, 430 U.S. 705 (1977)). While *Wooley* dealt with a misdemeanor statute whose violation resulted in the levying of an initial fine of $25 and a jail sentence of 15 days, 430 U.S. at 708, punishment under § 2257 provides for imprisonment for up to five years and fines, 18 U.S.C. § 2257(i), for violation of its recordkeeping requirement. The gravity of imposing criminal sanctions–and criminal sanctions of this magnitude–on protected speech cannot be overstated.

Moreover, as the majority points out, Congress amended § 2257 in 2006 specifically to expand the statute to include commercial and non-commercial sexually explicit images. Maj. Op. at 20-21. Child pornography, of course, is not only sold but traded and produced and consumed privately, all of which Congress intended to reach with this statute. The specific targeting of non-commercial sexually explicit images then makes uncertain what exactly the Assistant United States Attorney means in this case when he says that he would not enforce it to cover the hypothetical couple at issue. Maj. Op. at 22. This representation was made for the first time at the en banc oral argument. The majority acknowledges that neither the commercial-non-commercial line nor the sale-and-trade-private-use line as an attempted clarification offered by the newly promulgated regulations, 73 Fed. Reg. 77,421, 77,456 (Dec. 18, 2008), finds a basis in the statutory text. Congress's intent embodied in the statute is contrary–it intends to eradicate all forms of child pornography without regard to whether it is sold, traded, or kept privately in the home. Maj. Op. at 20-21. The statute criminalizes the *production* of sexually explicit images without the contemporaneous development of records, a

completely different matter from how the images are *used*. Therefore, the regulations do not change what is criminal, they merely enter into the Federal Register the promises made by the Assistant Attorney General regarding their intentions on how they will enforce the law. Congressional motives emphasize that even the attempted clarification offered by the new regulations is suspect because the Attorney General does not explain how it will enforce § 2257 on traded sexually explicit imagery but not that shared for free. Because federal criminal statutes outlast Attorneys General, the reach of the statute's text, not a promise from law enforcement nor a recently enacted regulation, is the proper focus of our inquiry.

More than simply the imposition of criminal sanctions on protected speech, § 2257 chills even those private couples who might otherwise engage in protected speech and follow its record-keeping requirements. Before producing sexually explicit images in their own homes, private couples must compile records, affix statements, and then subsequently maintain such records for at least five years. Indeed, § 2257 not only requires record-keeping, § 2257(a), but also the making of those records available for periodic inspection by the government, § 2257(c), allowing the government to inspect the location where records are kept at least once every four months, 28 C.F.R. § 75.5, requirements which are especially onerous on those who, as here, wish to engage in private and anonymous speech. "Privacy of communication is an important interest" and "fear of public disclosure of private conversations might well have a chilling effect" on that important interest "even without the reality" of surreptitious monitoring. *Bartnicki v. Vopper*, 532 U.S. 514, 532-33 (2001). Registration requirements have been recognized to have a significant chilling effect on speech because they force those who would speak anonymously "to forgo their right." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 166 n.14 (2002). The Supreme Court has noted the long and illustrious history of anonymous speech while at the same time pointing out that "identification requirement[s] [] tend to restrict freedom . . . of expression." *Talley v. California*, 362 U.S. 60, 64 (1960). The record-keeping requirement of § 2257 mandates not only record-making before engaging in protected speech between "neighbors," *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at

166, but also the universality of the record-keeping requirement mandates record-making before engaging in protected speech between friends, lovers, and a husband and wife.

While the records required by § 2257 will not necessarily be publicly available, *cf.* Maj. Op. at 9 (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 166-67) (no "undue barriers on [those] engaging in anonymous speech" exist because "nothing in the statute makes the required records available to the *public*"), the statute does provide for government access and does not provide for confidentiality. *See Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (suggesting that a statute requiring disclosure without a confidentiality guarantee chills speech). True, the Court in *Watchtower Bible & Tract Society of New York* discussed anonymity with respect to the canvasser vis-a-vis the general public, but not to be ignored is the Court's point that anonymity with respect to the canvasser vis-a-vis the government is important as well. 536 U.S. at 166-67. The Court emphasized that abhorrent to the First Amendment is the "very notion" that before engaging in "everyday public discourse[,] a citizen must first inform the government . . . ." *Id.* at 165-66. The *Watchtower Bible & Tract Society of New York* Court delves into a discussion of the anonymous distribution of handbills, *id.* at 166, citing cases such as *Talley* which detail the "important role" anonymous pamphlets have had in circulating "literature critical of the government" and the concomitant punishment meted out by the *government* of those discovered to have distributed these pamphlets anonymously, *Talley*, 362 U.S. at 64-65. The historical protection of anonymity was then of the dissident versus the government rather than between the dissident and the public-at-large. *See id.* Without a doubt then, mandated government disclosure chills both anonymous public and private speech–that is, it chills speech that may be in disfavor with the government–and it does so whenever the government requires disclosure even if only to the government itself.

The Court in *Watchtower Bible & Tract Society of New York* also explicitly rejected the argument that the majority appears to make, which reasons that if individuals are willing to expose themselves in sexually explicit imagery, then they can be made to expose other identifying information. *See* Maj. Op. at 9-10. In *Watchtower Bible & Tract Society of New York*, petition circulators went door-to-door seeking

signatures, and thus they revealed their physical identities. 536 U.S. at 167. Yet the Court held that "[t]he fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity." *Id.* In coming to this conclusion, the Court again pointed to the historical use of petitioning in drumming up interest in unpopular causes, *see Talley*, 362 U.S. at 64-65, when it wrote that the registration requirement "may preclude such persons from canvassing for unpopular causes," *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 167. This again draws attention to the historical protection of anonymity as against the government, not the general public, and therefore an individual may be willing to expose his or her physical presence in sexually explicit imagery or otherwise which acquaintances may recognize, and still retain an interest in not disclosing identifying information to the government. *Cf.* Maj. Op. at 13 (citing *Am. Library Ass'n v. Reno* (*ALA II*), 33 F.3d 78, 91 (D.C. Cir. 1994)) (making the inapposite comparison between identification requirements in the tax context and identification requirements in the First Amendment context where *ALA II* dealt with an as-applied challenge by trade organizations and corporations producing commercial sexually explicit imagery).

In an effort to rebut this argument, the majority returns to its central point that the government has not yet abused its power under § 2257 to prosecute those who wish to engage in anonymous speech. Maj. Op. at 10. But in the Supreme Court's anonymous pamphletting or canvassing jurisprudence, the Court has not hesitated to strike down laws that hinder those forms of anonymous speech in the absence of incidents of government abuse of dissidents under the particular statute before the Court. *Compare Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 166-67 (invalidating a law on overbreadth grounds because of its restrictions on anonymous speech with no mention of whether the government used the registration requirement of the statute before the court to harass those attempting to engage in speech) *with* Maj. Op. at 10 (arguing that the statute should be upheld for lack of anecdotes that suggest the "improper use of [§ 2257] records by government agents"). Indeed, the majority does not point to any decisions supporting the proposition that we should look to specific instances of governmental abuse of those who wish to speak anonymously with respect

to the particular statute before the court or that we should rely on the government when it says, "Trust me." On the other hand, no one can argue that the Supreme Court's history of protecting sexually explicit speech is not as long or illustrious as its history of protecting speech critical of the government or other disfavored speech. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 248 (2003) (Scalia, J., concurring in part and dissenting in part) (noting the Court's vigorous defense of virtual child pornography and sexually explicit cable programming while "smil[ing] with favor" upon a law that impinges upon "the right to criticize the government"); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 826 (2000) (writing that "[t]he history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly"–with reference to the sexually explicit speech at issue in the case). Our precedents are consistent: when it comes to injury-in-fact our case law has counseled against trusting in the benevolence of government not to apply a law where it can be applied according to its text by according standing so that those laws can be challenged. And when it comes to anonymous speech our case law has counseled against trusting in the benevolence of the government not to persecute those who engage in disfavored speech by striking down laws which threaten anonymous speech by requiring identification to the government.

In short, the chilling effect on private couples here has already been recognized in the Court's acknowledgment of criminal sanctions' chilling effect on speech and identification requirements' chilling effect on private speech and anonymous speech. The majority argues that this law ought not be invalidated in its entirety because enforcement against private couples may never happen. I would hope that would be so, but the statute by its language gives the government the ability to impose criminal sanctions on private couples for not creating and maintaining records. While the majority suggests that enforcement is a free-floating concern that militates against the substantiality of overbreadth, the majority does not point to any cases supporting its argument, casting doubt on the existence of such a case. The chilling effect analysis subsumes the enforcement concern into the more important issue as to whether private couples will be deterred from speaking, in consideration of not only whether the statute

will be enforced, but more importantly, what the statute requires in the first instance of those who wish to speak, whether the statute by its language can be enforced, and if enforced, how severe the sanctions on protected speech are. The majority counsels us that plaintiffs should rely on the fact that prosecution of private couples under this statute "has never occurred" and further that the day "may never come to pass" in which it is enforced. Maj. Op. at 22, 24. But where private couples are likely to be chilled from engaging in the speech at issue, a prosecution may never occur for the very reason that private couples have ceased engaging in speech that the statute makes unlawful–a repugnant outcome to the First Amendment and the core reason for the existence of overbreadth challenges. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Put differently, the chilling effect on private couples makes their claims ripe for adjudication. A law's chilling effect "justif[ies] a lessening of the usual prudential requirements for a pre-enforcement challenge to a statute with criminal penalties." *Nat'l Rifle Ass'n v. Magaw*, 132 F.3d 272, 284-85 (6th Cir. 1997) (citing *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)); *see also Warshak v. United States*, 532 F.3d 521, 533 (6th Cir. 2008) (en banc) (citing *Anderson v. Spear*, 356 F.3d 651, 669 (6th Cir. 2004))("a chilling effect might relax ripeness requirements in a First Amendment case"); *Currence v. City of Cincinnati*, 28 Fed. App'x 438, 441 (6th Cir. 2002) (citing *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)) ("Ripeness analysis is relaxed for First Amendment cases involving a facial challenge to a regulation because courts see a need to prevent the chilling of expressive activity"). "The loss of First Amendment freedoms[,] . . . [which] unquestionably constitutes irreparable injury," counsels against the typical ripeness standard. *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1057-58 (9th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (internal quotation marks omitted). No doubt "[t]he courts have repeatedly shown solicitude for First Amendment claims" particularly "with regard to facial challenges to a statute or ordinance." *Peachlum v. City of York*, 333 F.3d 429, 435 (3d Cir. 2003) (citing *Broadrick*, 413 U.S. at 612). When asserting third-party claims in overbreadth challenges, the litigant has not been required to show that the third-party claims are ripe. *See United States v. Williams*, __

U.S. __, 128 S. Ct. 1830, 1842-43 (2008); *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 167 n.14 (allowing the third-party claim of those who wish to canvass anonymously to factor into substantiality of overbreadth without any notion of whether claims had been or will be brought against them noting only that the statute would require them to surrender their anonymity); *see also The Supreme Court 2007 Term–Leading Cases*, 122 HARV. L. REV. 385, 393 n.80 (2008) (commenting that "[t]he Court routinely points to hypothetical unconstitutional applications without considering their likelihood" using *Free Speech Coalition* as an example where the statute at issue might subject "films such as *American Beauty*, *Traffic*, and *Romeo and Juliet*" to "severe punishment" even in spite of "the improbability [] the government [would] ever bring[] such prosecutions"). In *Williams*, the Court deemed "fanciful hypotheticals" those third-party claims–namely, a person offering non-pornographic photographs of young girls to a pedophile who expects that the pictures will contain child pornography, Hollywood movies that depict underage characters having sex, and persons who turn child pornography over to the police–that "[did] not implicate the statute," not those where enforcement had not been promised to those third-party claims falling under the statute.[4] 128 S. Ct. at 1843-44. The majority all but acknowledges that the law is unconstitutional as applied to private couples, Maj. Op. at 24, that the law applies to private couples by its text, Maj. Op. at 20-21, and that the law applies criminal penalties to those who violate the law, Maj. Op. at 4, but it decides, couched in the language of substantiality of overbreadth, not to invalidate the law on its face using concerns sounding in ripeness that suggest an exacting standard for ripeness of third-party claims. As noted before, the majority fails to cite to any cases to support this proposition, Maj. Op. at 22-24, which demonstrates a weakness to its argument in the face of our precedents which emphasize the gravity of the chilling of third parties where the statute criminalizes their protected speech by its text as does the statute here.

---

[4]For a hypothetical that did fall under the statute, documentary footage of atrocities committed in foreign countries, the Court took it seriously and moved to how it affected the substantiality balance. *Williams*, 128 S. Ct. at 1844. Where "the statute might cover"–by its language–the hypothetical, the Court did not ask whether enforcement would be sought. *Id.*

Substantiality, then, considers the third-party claims of the private couples without any additional notion of enforcement where it has been subsumed in other analyses. At the same time, our cases have brought issues such as a statute's chilling effect and its burden on speech to the forefront. The majority states that the question of substantiality is: When "is it appropriate to invalidate a law in all of its applications when its invalidity can be shown (or assumed) in just some of its applications?" Maj. Op. at 24. That could very well be framed as: "When is it appropriate to adjudicate unconstitutional applications of a statute on a case-by-case basis versus invalidating a law in its entirety because of some unconstitutional applications?" The second formulation not only brings to life a central concern that runs throughout overbreadth–namely that unconstitutional applications otherwise may never make it before the court because speakers refrain from speaking, injuring speech and leaving few left to challenge the unconstitutional law–it also presents for consideration the burden–as it pertains to the substantiality of overbreadth–on a private couple in challenging the law as-applied. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (acknowledging that overbreadth adjudication reduces the "social costs" of the "considerable burden (and sometimes risk) of vindicating [] rights through case-by-case litigation"). "[T]he opportunity to raise constitutional defenses at a criminal trial is inadequate to protect the underlying constitutional rights" in the face of possible criminal conviction because of the practical burden of "becoming enmeshed in protracted criminal litigation" and the corresponding waste of resources. *Perez v. Ledesma*, 401 U.S. 82, 118 (1971). Nor has the Court overlooked "the opprobrium and stigma" of criminal prosecution and conviction. *Am. Civil Liberties Union*, 521 U.S. at 872. Added to the burden on criminal defendants who would challenge the law in this case is the public scrutiny of a case dealing with private sexually explicit speech. *Cf.* Maj. Op. at 9. The social costs of case-by-case adjudication here are as great as in any prior Supreme Court decision.[5]

True, "that a criminal prohibition is involved does not obviate the need for the [substantiality] inquiry or *a priori* warrant a finding of substantial overbreadth." *New*

---

[5]This action was initiated only because of the adverse economic effect on Connection's magazine triggered by the reduction it experienced in adult subscribers' exchange of legal adult pornography after the enactment of this statute.

*York v. Ferber*, 458 U.S. 747, 773 (1982).  The majority argues that the application of § 2257 to private couples "has not been shown to involve a materially significant number of people."  Maj. Op. at 24.  The majority does not dwell on this argument, though, perhaps because our precedents have not required a showing by the litigant that a certain number of people are engaged in a particular activity; instead, we have analogized a third-party's claim to past cases in which we have or have not held a statute overbroad. *See Watchtower Bible & Tract Soc'y of N.Y.*, 536 U.S. at 166 (recognizing "a significant number of persons" in those who seek to canvass anonymously based on "our [prior] cases involving [the] distribution of unsigned handbills").  In other words, when the Supreme Court or our precedents have evaluated whether an "amount of protected speech" is "substantial," *Williams*, 128 S. Ct. at 1838, they have analogized to decided cases as to the interests at stake rather than demanding some statistics in accordance with the natural meaning of the word "amount."  At one extreme, the Tenth Circuit has held that "a First Amendment challenge to the facial validity of a statute is a strictly legal question; it does not involve the application of the statute in a specific factual setting." *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008) (citing *ACORN v. City of Tulsa*, 835 F.2d 735, 740 (10th Cir. 1987)).

Sexually explicit speech produced by consenting adults kept in the privacy of their own home is "ordinary and harmless speech" not unlike "conversations between neighbors."  *Riel v. City of Bradford*, 485 F.3d 736, 754 (3d Cir. 2007) (citing *Watchtower Bible & Tract Soc'y of N.Y.*, 536 U.S. at 165-66); *see also United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972) (citing *Katz v. United States*, 389 U.S. 347, 358 (1967)) (holding that in the Fourth Amendment context, "private speech," a "cherished privacy of law-abiding citizens" that the Bill of Rights was meant to safeguard, is shielded from "unreasonable surveillance").  "The uninhibited exchange of ideas and information among private parties" is an important interest protected by the First Amendment. *Bartnicki*, 532 U.S. at 532.  In *Stanley v. Georgia*, 394 U.S. 557 (1969), the Court emphasized the distinction between the "regulation of commercial distribution of obscene material" and the "mere private possession of such material." 394 U.S. at 563-64.  The Court understood the First Amendment's protection of speech

taking place in "the privacy of [one's] own home" with respect to other constitutional protections of the home by the Fourteenth Amendment, *id.* at 564 (citing *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)), and the Fourth Amendment, *id.* (citing *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *overruled by Katz*, 389 U.S. at 353 (1967)), in holding that the First Amendment protected private possession of obscene material in the home. *Id.* at 566. Regulation and criminalization of the private speech of private couples is similarly repugnant here.

Anonymous speech is also an interest of private couples. The Supreme Court has held that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). Many rationales for anonymity have been recognized by the Court, including the "fear of economic or official retaliation, [] concern about social ostracism, or merely [] a desire to preserve as much of one's privacy as possible," all concerns of which apply to private couples here with regard to the content of the speech at issue. *Id.* at 341-42. The interest in anonymity extends beyond handbills and political works to those producing literary works as well. *Id.* For instance, the author behind Shakespeare's work, *id.* at 341 n.4 (pointing out the possibility that Shakespeare was a pseudonym for the Earl of Oxford), has an interest in anonymity as someone depicting "teenage lovers" with the suggestion that they "consummated their relationship," *Free Speech Coal.*, 535 U.S. at 247. The majority draws an artificial distinction here based on whether "an historically significant mode of communication" is affected, Maj. Op. at 14, rather than looking to whether the group at issue has an interest in speaking anonymously according to a historically significant rationale for anonymous speech as the Court has done, *see Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 536 U.S. at 166-67; *McIntyre*, 514 U.S. at 341-43; *cf. Peterson v. Nat'l Telecomm. and Info. Admin.*, 478 F.3d 626, 632 (4th Cir. 2007) (dealing with a non-"historically significant mode of communication," Maj. Op. at 14, namely a website, but still considering whether the litigant has an interest in anonymous speech by looking to "the concerns underlying the right to anonymous speech," before concluding that he did not because he did not rely

on anonymity in his speech). "[T]he First Amendment protects anonymity where it serves as a catalyst for speech." *Peterson*, 478 F.3d at 632. The private adult couples here maintain an interest in anonymity with regard to the intensely personal and private nature of consensual sexually explicit imagery, the disfavored status of sexually explicit imagery, and the potential for social ostracism and official retaliation that comes from identification in sexually explicit imagery.[6]

As the majority points out, commercial producers have no interest in anonymous sexually explicit speech. Maj. Op. at 10, 13 (citing *ALA II*, 33 F.3d at 91). The Second Circuit has recognized this distinction as well, which mirrors the majority's analogy between record-keeping for private couples and record-keeping with regard to commercial producers, namely that between those website visitors engaging in commercial activity on the internet who have "no clear expectation of or interest in remaining anonymous" such that their identification passes First Amendment scrutiny, *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007), whereas identification requirements to enter sexually explicit websites force any non-commercial visitor to "forgo the anonymity otherwise available on the internet," *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003), in violation of their interest in anonymity, *SPGGC, LLC*, 505 F.3d at 195. Our private couples here are not unlike the non-commercial website visitor. The latter surfs sexually explicit websites with an expectation of privacy generally available on the internet, *Am. Booksellers Found.*, 342 F.3d at 99, just as the former produces sexually explicit imagery with an expectation of privacy generally available in private communications. Where the majority points out that the rise of "internet-based chat rooms and the like explain" at least part of the decline of Connection's subscriber base, Maj. Op. at 10-11, the majority implicitly acknowledges that anonymity is important to private couples and swingers because the

---

[6] As above, *Watchtower Bible & Tract Society of New York* foreclosed the argument that revealing one's physical identity means that one has no interest in anonymity. 536 U.S. at 167. For instance, in the trial of Robert Kelly, the success of the Shaggy defense–the bald assertion that "it wasn't me"–suggests that the difficulties in precise physical identification allow for anonymity even when a depicted person appears in an 27-minute sex tape. *See* Josh Levin, *Dispatches From the R. Kelly Trial*, SLATE, May 21, 2008, http://www.slate.com/id/2191876/entry/2191877/.

internet provides an anonymous alternative to speech covered by § 2257's record keeping requirements.

In addition, some amount of sexually explicit imagery produced by private couples will overlap with other constitutionally protected speech, including obscenity kept in the privacy of one's home, *Stanley*, 394 U.S. at 564-68, and nonobscene sexually explicit imagery of consenting adults generally, *see Free Speech Coal.*, 535 U.S. at 250-51. Taking the above together with private speech and anonymous speech, the amount of protected speech impacted is extensive indeed.

Similarly, the majority uses pure reasoning to calculate the "amount" of speech falling within the statute's plainly legitimate sweep. *See* Maj. Op. at 19-20. In surmising that the amount of speech involving Connection and its subscribers is small, the majority reasons that swingers represent a minority of those in the pornography industry but does not make an attempt to quantify this number. *Id.* The evidence with regard to the amount of sexually explicit imagery consisting of young-looking models, which the majority argues falls within the statute's plainly legitimate sweep, is flawed as well. First, it is worth pointing out that their evidence deals only with commercial sexually explicit imagery. Second, the majority concludes that the amount of sexually explicit imagery consisting of young-looking models is vast by combining the generally accepted notion that the commercial pornography industry is vast with the Attorney General's Commission on Pornography and a Senate Judiciary Committee hearing on § 2257 which both assert that most commercial pornography depicts young-looking persons. This is a lot of weight to put on evidence from the 1980s (1986 and 1988, respectively), particularly when the rise of distributed means of production, e.g., digital cameras and camcorders, explains why an overbreadth challenge presenting the rights of private couples to produce sexually explicit imagery has far more basis today than it did in the 1980s. Twenty years have passed since these reports, and meanwhile digital video and still cameras have become ubiquitous, where before the capacity to capture sexually explicit images may have resided in the hands of far fewer people. This means equally a rise in production of non-commercial sexually explicit imagery and

commercial pornography involving a broader range of interests.[7]  A few comments from 20 years ago have little relevance today, and thus, the Government has not met its burden here.  *See Playboy Entm't Group, Inc.*, 529 U.S. at 816-17 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Regardless, commercial pornography does not fall within the statute's plainly legitimate sweep.  The majority suggests that all commercial pornography falls within the statute's plainly legitimate sweep because commercial pornography is dominated by young-looking models which fall within the statute's plainly legitimate sweep.  Maj. Op. at 19.  However, the majority does not have much confidence in this suggestion, as it only can say that commercial pornography "is the setting in which it is easiest to accept the constitutionality of these proof-of-age requirements."  Maj. Op. at 20.  But *Broadrick* and our overbreadth case law instruct courts to look at the legitimate sweep of the statute which is "plain," 413 U.S. at 615, not that which is easiest to accept.[8]  The majority all but concedes that the application of § 2257 is "problematic" with regard to sexually explicit images in which the actors and actresses are clearly middle-aged individuals.  Maj. Op. at 20.  That acknowledgment in itself shows that the legitimacy of § 2257 as applied to commercial pornography is not plain.[9]

Nor is the constitutionality of the statute as applied to young-looking models in commercial pornography plain.  *Free Speech Coalition* held that virtual child pornography could not be regulated[10] for the purpose of regulating child pornography,

---

[7]The record shows that in 2005, www.AdultFriendFinders.com, a site for swingers, had over 13 million personal ads, consisting of personally written text and personally produced sexually explicit images, with 96% to 98% of those ads placed by couples where both individuals were over the age of 21.

[8]The opinion of Connection's counsel as to the constitutionality of the statute as applied to young-looking models in commercial sexually explicit imagery is irrelevant to whether said application is actually plainly legitimate according to Supreme Court precedent.  *Cf.* Maj. Op. at 19-20.

[9]The district court judge in *ALA II* held § 2257 unconstitutional, and on appeal, one judge dissented from the majority's reversal.  *ALA II*, 33 F.3d at 94-95.

[10]The Court in *Free Speech Coalition* expressly rejected the argument that the statute at issue did not suppress or criminalize speech because it gave the defendant an affirmative defense "to avoid conviction for nonpossession offenses by showing that the materials were produced using only adults and were not otherwise distributed in a manner conveying the impression that they depicted real children."

simply because virtual child pornography depicted those who "appear[ed] to be" children. 535 U.S. at 254-55. Section 2257 requires records of young-looking models–otherwise known as those models who appear to be children–in an effort to regulate actual child pornography, an analogous situation to that in *Free Speech Coalition*. *See id.* No children are abused in the creation of commercial pornography with young-looking models. *Id.* at 236. The majority distinguishes our case from that in *Free Speech Coalition* by referring to the level of scrutiny applied–that is, intermediate scrutiny here versus strict scrutiny in *Free Speech Coalition*, Maj. Op. at 14–but that does not change the Court's concern with "[p]rotected speech . . . becom[ing] unprotected merely because it resembles" unprotected speech, *Free Speech Coal.*, 535 U.S. at 255. Rather, it only addresses whether that concern when combined with the level of scrutiny suffices to invalidate a law, or whether the concern simply militates in favor of invalidating it. Nevertheless, one need not agree that the law ought to be invalidated on the basis of *Free Speech Coalition*; it is enough to agree that the reasoning of *Free Speech Coalition* calls into question whether the application of § 2257 to young-looking models in commercial sexually explicit imagery is plainly legitimate.[11]

To decide the constitutionality of § 2257 as applied to young-looking models in commercial sexually explicit imagery where the Supreme Court has not ruled is to "formulate a rule of constitutional law broader than is required by the precise facts," which the majority counsels against. Maj. Op. at 18 (quoting *Wash. State Grange v. Wash. State Republican Party*, __ U.S. __, 128 S. Ct. 1184, 1191 (2008)). The majority

---

535 U.S. at 255. Indeed, this covers much (if not all) of the protected speech the majority used to weigh in favor of calling the statute substantially overbroad. The argument that the protected speech here is not criminalized or suppressed by § 2257 then is unavailing because the Court in *Free Speech Coalition* makes clear that we must look at the burdens put on speech–as there, raising an affirmative defense during a criminal felony prosecution. Private couples here must compile records, affix statements to the images, and then subsequently maintain such records for at least five years with law enforcement being able to enter the home at least once every four months to inspect the records; or in the alternative, private couples must face punishment under § 2257 which includes imprisonment for up to five years and fines.

[11] Couple this with the developing nature of the Supreme Court's First Amendment jurisprudence generally and we must decline to opine that the regulation of young-looking models in commercial sexually explicit imagery is plainly legitimate. *See also Williams*, 128 S. Ct. at 1841-42 (analyzing the plainly legitimate sweep of the statute by looking to established categorical exceptions to First Amendment protection, namely the lack of protection for "[o]ffers to engage in illegal transactions" and the well-documented distinction between "a proposal to engage in illegal activity and the abstract advocacy of illegality").

seems today to try to craft a law that applies to commercial sexually explicit imagery, Maj. Op. at 19-20, which at the same time does not apply to private couples, Maj. Op. at 24. In so doing, the majority attempts to both rule on overbreadth at the same time as it formulates a new constitutional rule with regard to the legality of a universal record-keeping requirement in the commercial production of sexually explicit imagery. Perhaps the majority is attempting to decide constitutional and unconstitutional applications of the statute when it asserts that "[a] court may enjoin the unconstitutional *applications* of the law while preserving the other valid applications of the law," it need not invalidate a entire statute when it cannot "sever an offending portion of the *text* from the rest of the statute," Maj. Op. at 26. The authorities cited by the majority do support this proposition, but whether a law can be crafted prospectively in this way depends on "how easily we can articulate the remedy." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). On the other hand, "making distinctions in a murky constitutional context . . . may call for a far more serious invasion of the legislative domain than we ought undertake." *Id.* at 329-330 (citing *United States v. Treasury Employees*, 513 U.S. 454, 479 n.26 (1995)) (internal quotation marks omitted). The Supreme Court has thus continued to emphasize refraining from prospectively setting out a law's constitutional and unconstitutional applications for claims, by the litigant representing himself or third parties, where it is not a "relatively simple matter." *Treasury Employees*, 513 U.S. at 479 n.26 (citing *United States v. Grace*, 461 U.S. 171, 180 (1983)). Therefore, the plainly legitimate sweep of the statute is in its coverage of child pornography. *See Osborne v. Ohio*, 495 U.S. 103, 109-15 (1990).

By the time I reach the issue of substantiality, most of the work has been completed. With my differing approach to the requirements for substantiality, my analysis will proceed much differently from the majority's. The protected speech impacted is that of private couples producing sexually explicit imagery. The plainly legitimate sweep of the statute is in its coverage of producers of child pornography. The chilling effect of the statute to private couples is severe in recognition of the statute's application by its text to private couples, the statute's criminal penalties, its invasion of privacy, and its identification requirements. The burden on case-by-case resolution to

this problem is also severe because of the possibility of imprisonment and other criminal sanctions, the expense of resources in mounting a defense, and the social opprobrium in the association with recorded sexually explicit activity. As argued above, the chilling effect is such that case-by-case resolution may never come to pass because speakers refrain from speaking.

The overbreadth analysis in *Free Speech Coalition* is instructive because it deals with a statute whose plainly legitimate sweep amounted to child pornography and obscenity. 535 U.S. at 256. But the statute covered the depiction of sexually explicit activity between youths under the legal age which did not amount to obscenity and did not use actual children. *Id.* at 246-47. The Court in *Free Speech Coalition* held that the statute was substantially overbroad with emphasis on the fact that enforcement of the statute against non-obscene sexually explicit imagery depicting sexually explicit activity between youths, even though the depicted persons were either adults or simulated, took the statute far astray from its purpose in preventing the abuse of children, 535 U.S. at 245, to the point where it intruded on speech we take for granted such as Hollywood movies and Shakespeare, even in spite of the unlikelihood of prosecution in those circumstances, *id.* at 247-48. The majority here similarly acknowledges that the application of § 2257 to private couples "is far removed from the underlying purposes of the Act," Maj. Op. at 23, suggesting the substantiality of overbreadth. In other words, the "[p]rotected speech does not become unprotected merely because it resembles the latter" when the underlying purpose of the statute is not being served; "[t]he Constitution requires the reverse." *Free Speech Coal.*, 535 U.S. at 255. The statute at issue in *Watchtower Bible and Tract Society of New York* covered both those going door-to-door to carry out commercial transactions or solicit funds and those making the rounds for religious, political, or other advocacy purposes. 536 U.S. at 168. Because the government's rationale in enacting the statute was to prevent crime and fraud, "the ordinance significantly restricted a substantial quantity of speech unrelated to the [government's] interest in eliminating fraud and unwanted annoyance," and so the Court invalidated the law on its face for overbreadth. *Id.* at 160 (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 240 F.3d 553, 572 (6th Cir. 2001)

(Gilman, J., dissenting), *rev'd by* 536 U.S. 150 (2002)).  Similarly, the over-inclusive reach of the statute here sweeps in all sexually explicit images, whether created for commercial purposes or non-commercial purposes, whether distributed widely or kept in the privacy of one's own home, or whether the individuals depicted are young-looking or clearly over the age of majority.  The government seeks to prevent child pornography, an important if not paramount governmental interest, but cannot do so by burdening speech of such importance and sweep, far removed from the purposes of the statute. Indeed, overbreadth exists to cure statutory imprecision when the legislature has drafted a statute which by its text reaches expressive activity far afield from its valid exercise of its power.  The majority argues that the Court in *Free Speech Coalition* applied the "most skeptical level of review" because the statute "did not hew closely enough to any of the government's asserted interests in enacting the law," both seemingly conflating overbreadth and as-applied analysis, at the same time as it ignores its own suggestion that the "most skeptical level of review" ought to apply to § 2257 as part of an overbreadth analysis for departing drastically from the government's asserted interests in enacting the law.  *See* Maj. Op. at 14.

Otherwise, the Supreme Court has not provided much guidance on the factors that make up the substantiality inquiry.  The majority clings to a statute that it admits is flawed, all but conceding that the statute is fatally flawed if applied, holding on to the representation that there will be no prosecutions in the feared circumstances.  The uncontroverted illegality of the statute as a matter of law leads the majority to search out defects in the litigants' factual showings, namely those facts that exist out in the world, in an effort to defeat their proffered arguments, not the merits of their case.  The Supreme Court has never done this.  *Williams* is instructive, as there, the Court evaded the third-party arguments by construing the statute differently from the Eleventh Circuit so that the statute did not apply to the categories of speech that the Court of Appeals placed into the protected-speech-impacted category used to invalidate the statute on overbreadth grounds.  128 S. Ct. at 1842-44.  Generally, the Court has reinterpreted laws to avoid application to protected speech so as to tilt the overbreadth balance against invalidation in those circumstances.  *See also Hicks*, 539 U.S. 113 at 122 (interpreting

"legitimate business or social purpose," contrary to the Virginia Supreme Court, to include leafleting and demonstrating, removing that protected speech from the overbreadth determination). But here, the majority agrees that the statute would apply to private couples by its text and that there is no way around this conclusion based on the statute Congress has drafted. Moreover, the interests of private couples accords with those interests in speech the Supreme Court has historically recognized as substantial and worthy of protection under the First Amendment. The majority's only answer is that no enforcement has been promised, which is contrary to the very notion of the rule of law when the statute applies to private couples by its text. And particularly in the First Amendment context, "[w]here regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute . . . which prescribes the limits of permissible conduct and warns against transgression." *Thornhill v. Alabama*, 310 U.S. 88, 98 (1940) (citing *Schneider v. New Jersey*, 308 U.S. 147, 155 (1939)).

No court has looked to the likelihood of enforcement as the majority does in determining substantiality. Maj. Op. at 22-24. Indeed, the majority cites no cases for the proposition that the lack of past enforcement or the promise of no future enforcement militates against finding a statute overbroad. *Cf. id.* And unlike the hypotheticals in *Williams*, the statute indisputably applies to private couples by its text. An application of the statute under those circumstances is clearly unconstitutional. Moreover, it attaches severe criminal sanctions and requires identification for the protected speech, such that, together, there is a likelihood of chilling the protected speech. The costs of case-by-case adjudication of the unconstitutional applications of the statute are high in consideration of the possibility of a lengthy imprisonment (up to five years), lifelong status as a felon, and social opprobrium for association with producing sexually explicit imagery. Finally, to reach speech excluded from protection under the First Amendment, the statute inhibits protected speech, under circumstances far flung from the underlying purpose of the statute. For those reasons, I would hold the statute unconstitutionally overbroad.

In citing to *Faustin v. City & County of Denver*, 423 F.3d 1192 (10th Cir. 2005) and *West v. Derby United Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000), Maj. Op. at 25, the majority misses the point in an illustrative way. *Faustin* and *West* both dealt with local (city and school) policies. *Faustin*, 423 F.3d at 1195; *West*, 206 F.3d at 1361. The court in *Faustin* was even dealing with an *unwritten* policy, 423 F.3d at 1195, so of course the court had to inquire as to enforcement merely to understand the boundaries of the unwritten policy. The court in *West* dealt with a school district's "Racial Harassment and Intimidation" policy. 206 F.3d at 1361. To understate the fact, neither has the force of law of a federal criminal statute. The relevance of that fact is embodied in the severity of punishment at issue–5 years imprisonment and fines versus no punitive aspect to the policy at all, *Faustin*, 423 F.3d at 1196-98, and suspension from school, *West*, 206 F.3d at 1361–and the importance of a law's text in understanding its scope–a federal statute can be enforced everywhere according to its text while a local policy does not develop its dimensions until it is enforced. In other words, to even understand what a school district's policy means, a court must look to how it was enforced in the past. The court in *West* did exactly that when it "consider[ed] [a] limiting construction which the school district ha[d] given the policy" by looking to whether the school had ever "disciplined a student for possessing in textbooks and other school materials with legitimate educational purposes depictions of the Confederate flag or other racially divisive symbols." 206 F.3d at 1368. The concept that ties all of the considerations together–once again, that the majority ignores–is that the force of law of a federal criminal statute means that a chilling effect exists where a statute by its text applies to a category of protected speech.

The majority's arguments regarding the "thin record" in this case, Maj. Op. at 21-22, are similarly unpersuasive because the majority never argues that substantiality does not involve legal analysis analogizing to other interests past courts have found to be substantial rather than some kind of quantitative analysis counting the number of people affected. This argument might be countered with the notion that the majority only requires a more developed record as part of the exercise of its judgment with respect to substantiality, and it does not go so far as to demand hard numbers. *See* Maj.

Op. at 25. However, this statement merely obscures the fact that a heavy record as to speech has never been required in overbreadth challenges on behalf of third-parties. Put differently, the majority imposes a requirement of the plaintiffs here that has teeth in punting their claim but no bite in the subsequent legal analysis that we must perform. The Supreme Court has acknowledged that facial challenges "invite judgments on fact-poor records" which is why overbreadth is allowed in limited circumstances such as the free speech arena because of the potential *chilling effect* of the statute at hand. *Sabri v. United States*, 541 U.S. 600, 609 (2004).

Indeed, the majority writes as if the thin record as to those engaging in this kind of speech layers abstraction on top of the abstraction that comes with lack of enforcement. Maj. Op. at 22. On the contrary, the thin record and the lack of enforcement are merely two aspects of the same concept–a concept that is endemic to and in fact the touchstone of overbreadth challenges. That concept is the chilling effect. The consideration of the chilling effect in free speech cases allows for weakened third-party standing and ripeness requirements in overbreadth challenges that necessitate a more abstract debate. The majority never argues that third-party claims are not properly before us whether because Connection and the Does have no standing or because the third-party claims are not ripe. Nor does the majority explain why lack of enforcement would not disqualify a first-party claim by private couples while at the same time the majority will not consider the third-party claims of the private couples before it. The third-party claims of the private couples are before us. We not only are deciding Connection's claims, we are deciding the claims of private couples who are before us. The doctrines of standing and ripeness function as gate-keepers, blocking the kinds of claims that the majority says are before us today. In letting Connection and the Does through the gate, likely because the majority cannot rebut the lesser requirement for third-party standing and ripeness in overbreadth, we turn to the constitutionality of the statute because our decision binds subsequent courts and litigants as the majority decision stands for the proposition that § 2257 is not overbroad. If the majority had argued that Connection and the Does did not have third-party standing to make an overbreadth challenge on behalf of private couples, then the majority's holding would

not serve as binding precedent to a subsequent litigant bringing a third-party overbreadth challenge who had a more-developed record. The difference is between deciding the case on justiciability grounds and substantive overbreadth grounds. The majority holds itself out as agnostic as to whether the statute is actually overbroad. Yet it decides the case on substantive grounds which declare that the statute is not overbroad. With this in mind, concern for the underdevelopment of the record falls away.

If lack of enforcement is insufficient per se to doom an overbreadth challenge as the majority acknowledges, Maj. Op. at 25, then the only conclusion that can be drawn is that the statute is overbroad because the majority lacks other considerations of any force. *Id.* The majority acknowledges the costs to case-by-case adjudication, Maj. Op. at 24-25, and rebuts that with discussion of possible "harmful effects" to invalidating a statute with some constitutional applications, *id.* Our cases have not required us to do any kind of statistical or economic analysis when it comes to either of these requirements. The majority, without attempting any comparisons to cases in which overbreadth has been found substantial or the costs of case-by-case adjudication have outweighed the costs of facial invalidation, appears to reject the value of the speech at issue. Our cases describe the overbreadth that counts as substantial, so that we need to compare our case to such prior cases to understand overbreadth in the case before us. As an example, in *Free Speech Coalition*, the Court invalidated a law which aided law enforcement in the prosecution of child pornography and surely that came at great cost because of the tremendous harms of child pornography and the difficulties in its prosecution. 535 U.S. at 254-55. Nevertheless, the costs of the suppression of lawful speech (in *Free Speech Coalition*, virtual child pornography, 535 U.S. at 254) and its chilling effect outweighed the considerable harm in a weakened ability for the government to prosecute child pornography. The majority opinion fails to square the balancing required of it with the prescribed balance of *Free Speech Coalition*.

As for the remedy, I agree with the majority that, after overbreadth has been identified, "[a] court may enjoin the unconstitutional applications of the law while preserving the other valid applications of the law," Maj. Op. at 26, but I disagree that the possibility to exercise that technique exists here. The cases make clear that "the

touchstone for any decision about remedy is legislative intent." *Ayotte*, 546 U.S. at 330. The majority itself admits that the legislature amended § 2257 in 2006 to "cover[] commercial and non-commercial pornography." Maj. Op. at 20; *see also Connection Distributing Co. v. Keisler* (*Connection III*), 505 F.3d 545, 552-54, 565 (6th Cir. 2007). Moreover, the expressed point of the law is to deal with all sexually explicit images of children, Maj. Op. at 2, and that makes no distinction between child pornography sold, traded, or created and kept in the privacy of one's own home and other legal adult sexually explicit imagery produced and kept in the privacy of one's own home. Congress would intend § 2257 to proscribe all of the aforementioned forms of sexually explicit images of children but how it would do so while at the same time not reaching the private production of sexually explicit images of adults is unclear under the existing form of the law when, by its terms, it is meant to reach private, non-commercial sexually explicit images. The majority does not propose a principled way to enjoin unconstitutional applications of the law while staying faithful to the legislature's intent. I do not doubt that it may be possible. I merely understand that alleviating the First Amendment concerns of the statute while at the same time maintaining the statute's legitimate applications requires a freer hand and more creativity than we have as judges.

In addition, I would hold that the statute is unconstitutional as applied to Connection and its advertisers for the simple, uncontroverted fact that the vast majority of swingers, Connection subscribers, and Connection advertisers are over the age of 21 if not middle-aged, and at the same time, § 2257 requires universal age-verification and recordkeeping such that they must create at the time of production and maintain records for those of all ages. None of the majority's arguments about the subjectivity of determining the ages of young-looking adults or the submission of body parts in lieu of a full-body photo with a face-shot changes that. *Cf.* Maj. Op. at 11-13. It is up to the legislature to consider those factors in drawing a sufficiently narrowly-tailored statute. Possibilities have been suggested: e.g., a statute requiring full-body shots that can be cropped if the advertiser only desires to show a body part, *cf. id.*, and a statute requiring identification of those under the age of 26, *Connection III*, 505 F.3d at 571 (Moore, J.,

concurring).[12]    The statute as it is drawn burdens substantially more protected speech–that is, the speech of the vast majority of swingers, Connection subscribers, and Connection advertisers who are over the age of 21, if not middle-aged–than is necessary to advance the legislature's compelling interest of eliminating child pornography.  And accordingly, I would hold the statute unconstitutional as applied to Connection and its advertisers as well.

For the forgoing reasons, I would reverse the grant of summary judgment to the government.

---

[12]I make no comment about the constitutionality of those proposals because those cases are not before us. Just how a statute that would meet constitutional muster should be drafted is not obvious.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting, joined by Judges MARTIN and COLE. I join in Judge Kennedy's dissenting opinion and agree that 18 U.S.C. § 2257 is facially overbroad because it burdens, through the threat of criminal sanctions, a substantial amount of protected speech, a primary example being images made and kept by adult couples in the privacy of their own homes. The majority all but admits, as it must, that § 2257 covers the production of these protected images, and I agree with Judge Kennedy that the government's purported lack of enforcement in this area does not alter the analysis. I write separately only to elaborate on the additional conclusion of Judge Kennedy's dissent that § 2257's universal age-verification and record-keeping requirements, which apply equally to old and young alike, are unconstitutional as applied to Connection and to John and Jane Doe.

Although § 2257[1] applies only to sexually explicit images, the majority contends that the law is content-neutral and should be evaluated pursuant to the intermediate-scrutiny standard. The majority asserts that a regulation of speech is content-neutral so long as the government was aiming at the "secondary effects" of the speech, Majority Op. at 7, and cites several cases dealing with "time, place, and manner regulations" that affect speech, *see, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002); *Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). The zoning ordinances at issue in these cases, as well as the "secondary effects" at which they were aimed, are much different than the statutory scheme before us. In the controlling opinion in *Alameda Books*, Justice Kennedy emphasized the unique quality of such zoning restrictions, explaining that "[t]he zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional." 535 U.S. at 449 (Kennedy, J., concurring in judgment). *Alameda Books* concerned a zoning ordinance prohibiting the

---

[1]In the interest of brevity, I refer to the universal age-verification and record-keeping requirements enforced under § 2257 and its applicable regulations as "§ 2257."

establishment of more than one adult-entertainment business in the same building. The city enacted this regulation in response to evidence that concentrations of adult businesses were associated with higher rates of robbery, thefts, prostitution, and assaults in the surrounding neighborhood. The secondary effects at which the government aimed were thus quite distinct from the regulated speech itself. Here, the line between the direct effects and the secondary effects of the speech is much blurrier than in these zoning cases. Unlike these time, place, and manner restrictions, the evil at which § 2257 is aimed, child pornography, is a type of speech, albeit unprotected, that is a subset of the regulated speech, sexually explicit images. It is therefore impossible to separate the content-based aspect of the regulation from the justification, as the justification itself relates to an aspect of the speech: its sexually explicit nature. As explained in my concurrence in the panel opinion, § 2257 is precisely the type of content-based restriction of speech to which we must apply strict scrutiny. *See Connection Distrib. Co. v. Keisler*, 505 F.3d 545, 568 & n.1 (6th Cir. 2007) (Moore, J., concurring).

Because I conclude, however, that § 2257 is unconstitutional as applied to Connection and the Does regardless of whether intermediate scrutiny or strict scrutiny applies, I will assume for purposes of this dissent that intermediate scrutiny is applicable. Under intermediate scrutiny, challenged regulations of speech can be upheld only if the government shows "that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791. I agree that the government has a significant, indeed compelling, interest in preventing the sexual exploitation of minors in child pornography. I cannot agree, however, that § 2257 is narrowly tailored to this interest. In the context of intermediate scrutiny, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985) (alteration in original)). Although, unlike under strict scrutiny, the regulation need not be the least restrictive means of promoting the substantial government interest, *id*. at 798-800, it may not "burden substantially more speech than is necessary to further the government's legitimate interests," *id*. at 799. In

other words, if the government "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," the regulation is not narrowly tailored. *Id.*

Given the alarming breadth of the universal age-verification requirement at issue, I must conclude that § 2257 burdens substantially more speech than is necessary to further the government's interest in preventing the sexual exploitation of minors. According to the government, Congress's purpose in enacting § 2257 was to prevent the sexual exploitation of minors in child pornography. Elsewhere, Congress has chosen to advance these ends directly by passing a flat ban on the production of child pornography. *See* 18 U.S.C. § 2251. It also has chosen to advance these means indirectly by prohibiting the distribution, receipt, and possession of child pornography. *See* 18 U.S.C. § 2252; *see also New York v. Ferber*, 458 U.S. 747, 765 (1982) (upholding a similar state statute); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (same). These indirect regulations advance the goal of preventing the sexual exploitation of children by destroying the market for materials depicting such activity. *See Osborne*, 495 U.S. at 109. In both the direct and indirect regulations, Congress has chosen to advance its interest in preventing the exploitation of minors by regulating materials depicting the exploitation of minors.

The regulation at issue in this case, § 2257, does not apply solely to child pornography. It applies to a class of materials much broader than those depicting what Congress ultimately seeks to prevent, and therefore does not seek to advance Congress's ultimate goal directly, or even as directly as § 2252's prohibitions on distribution, receipt, and possession of child pornography. Instead, Congress seeks to supplement these existing bans by imposing age-verification and record-keeping requirements on all visual depictions of actual sexually explicit activity, regardless of the age of the performers. In this regard, the means employed by § 2257 are distinguishable from, and significantly broader than, those employed by §§ 2251 and 2252.

According to the majority, § 2257 advances the interest of protecting minors from sexual exploitation in four ways. First, "[i]t ensures that primary producers of pornography confirm that performers are of age before filming them." Majority Op. at

9. Second, "it permits secondary producers . . . to ensure that the individuals depicted in their publications are of age." *Id.* Third, "it prevents children from attempting to pass themselves off as adults." *Id.* Finally, "it creates a compliance system in which law-enforcement officers not only can identify the performers depicted in magazines and movies and verify their ages but also can eliminate subjective disputes with producers over whether a model's *apparent* age should have triggered an age-verification check." *Id.* Thus, unlike the range of other statutes enacted to meet the same goal, § 2257 does not regulate child pornography directly. It is instead part of a larger regulatory scheme designed to stamp out the production of, and demand for, materials depicting the sexual exploitation of minors. In other words, to aid enforcement of a ban on unprotected speech, § 2257 regulates a broad category of protected speech, the vast majority of which receives First Amendment protection. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) ("[N]onobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment.").

The key question is whether the means employed in § 2257—imposing age-verification and record-keeping requirements on all who produce depictions of actual sexually explicit conduct, regardless of the performers' ages—burdens substantially more speech than necessary to prevent the sexual exploitation of minors in child pornography. The majority believes that the universal age-verification and record-keeping requirements do not impose a burden on adults who wish to advertise in one of Connection's magazines. According to the majority, because advertisers must give their records only to Connection and not to the general public, and because these advertisers are already submitting revealing photographs with their names and addresses, no "individuals would shy away from producing verification of their ages as well." Majority Op. at 10. This ignores the individual defendants before us, the Does, whose speech has been chilled by their fear that the government will view their images as obscene and will prosecute them for obscenity. Given the vagueness historically associated with defining obscenity, this fear cannot be said to be irrational. *See, e.g.*, *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I know it when I see it . . . ."). Further, the majority vastly understates the difference between providing

perfunctory contact information to a magazine to which one submits anonymous photos and providing government-issued photo identification which must be kept on file for government inspection and through which one can be identified by the government as a performer in sexually explicit images.  As Judge Kennedy notes, the Court has previously recognized that individuals have an interest in anonymous speech. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166-67 (2002).  Even the fact that many of the photographs may reveal the performers' "physical identities [does] not foreclose our consideration of the [performers'] interest in maintaining their anonymity."  *Id*. at 167.

The majority argues that identifying oneself to the public, as in *Watchtower*, is different than identifying oneself to Connection and the government.  Majority Op. at 9-10.  Although, as the majority notes, advertisers must provide Connection with a name and address, providing this contact information, which may be merely a post-office box, is different than providing government-issued photo identification, which may contain such information as one's driver's license number, physical address, and, of course, date of birth.  Further, the statute requires that Connection keep these records, including a copy of the identification document, on file for inspection by the government "at all reasonable times."  § 2257(c).  *Watchtower* makes clear that speakers have an interest in anonymity with respect to the government as well as the public at large, as "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."  536 U.S. at 166.  To minimize this interest is to minimize the prohibitive effect § 2257 may have on adults who wish to advertise in Connection's magazines.  But, the majority argues, the ultimate goal of these advertisers is to make "connections" with other swingers, in which case they will have to "lift the veil of anonymity."  Majority Op. at 10.  Again, *Watchtower* recognizes that revealing one's physical appearance to members of the public is a protected interest and is very different from providing identification to the government.  536 U.S. at 166-67.  To be sure, Connection generally does not publish an individual advertiser's contact information, but instead prints an identification code so that an interested reader can contact

Connection, which will then forward the reader's contact information to the advertiser, who can then choose whether to contact the reader. In any case, the advertiser chooses how much information to include in his or her advertisement. In this way, Connection's process is designed to maintain the confidentiality of its advertisers. Even "facilitating a liaison," Majority Op. at 10, would not require an advertiser to reveal his or her true identity to the person with whom the advertiser meets, much less give the advertiser's full name, physical address, date of birth, and driver's license number. Revealing one's sexual tendencies to the government is very different from revealing these tendencies to someone who has been chosen and pre-screened and is known to share these same tendencies. The majority's attempts to minimize § 2257's burden on protected speech thus fail.

Imposing this burden on Connection and its potential advertisers does not advance Congress's goal of ending child pornography. The evidence in the record indicates that the vast majority of swingers are middle-aged and accordingly not at risk of being mistaken for minors, and the record contains no indication of swingers engaging in sexual exploitation of minors. Accordingly, in the vast majority of instances, applying § 2257's age-verification and record-keeping requirements to this population does not advance the government's interest in preventing child pornography, but instead operates to burden constitutionally protected speech without any corresponding benefit. Indeed, this is true of all visual depictions of actual sexually explicit activity involving performers who are clearly above the age of majority. Because a substantial portion of the burden on speech does not serve to advance the government's asserted goal, § 2257 is not narrowly tailored to the government's interest in preventing the sexual exploitation of minors in child pornography.

The Supreme Court's opinion in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), bolsters this conclusion. There, the Court struck down a statute "extend[ing] the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children." *Id*. at 239. Although the Court there struck down the law on its face for overbreadth, the Court's reasoning is instructive. Key to the Court's conclusion was the fact that the speech at issue

"record[ed] no crime and create[d] no victims by its production" and consequently was protected speech. *Id*. at 250. The government nonetheless sought to justify its ban on this protected speech as a means to ban unprotected speech. The Supreme Court noted that such an "analysis turns the First Amendment upside down." *Id*. at 255. I agree. In the majority of instances, § 2257, like the statute at issue in *Free Speech Coalition*, burdens speech that is neither criminal nor unprotected, as a means of banning unprotected speech (namely, child pornography). I conclude that such a regulatory regime is not narrowly drawn, and accordingly I would hold that § 2257's universal age-verification requirement is not narrowly tailored to the goal of curbing child pornography.[2]

To illustrate this point, Connection proposes a more-narrowly tailored regulation, modeling its proposal on the regime governing tobacco sales. According to Connection, store clerks are required to ask for identification whenever someone who appears under the age of twenty-six attempts to purchase tobacco products, even though it is legal to purchase such products upon turning eighteen. This regulatory scheme is designed to ensure that people who fall into the age range where they may or may not look old enough to buy tobacco are identified, while people who are clearly of-age are not inconvenienced. As the majority notes, Majority Op. at 11, the availability of a more tailored regulation does not, by itself, demonstrate that the regulation at issue fails the narrow-tailoring test, as intermediate scrutiny does not require that the regulation be the least restrictive means of achieving the government's interest. The point here is that alternatives exist that will burden substantially less protected speech, yet advance the government's asserted interest equally well, which is precisely why § 2257 is not narrowly tailored.

This is not to suggest that Congress must employ an analogous regulatory scheme, but rather to illustrate that it is possible to pursue an interest in identifying minors without burdening those who clearly are not minors. Additionally, a regulation

---

[2]*Free Speech Coalition*, of course, is distinguishable in that it banned certain protected speech, while § 2257 merely burdens the speech. This distinction, however, is not dispositive. As noted above, the evidence in this case demonstrates that § 2257 places a substantial chill on certain types of expressive conduct and thus has an effect very similar to that of a flat ban.

similar to Connection's proposal appears to tack more closely to Congress's actual goal in passing § 2257. As the D.C. Circuit noted, "The 1988 Act was passed by Congress on the recommendation of the Attorney General's Commission on Pornography." *Am. Library Ass'n v. Reno*, 33 F.3d 78, 81 (D.C. Cir. 1994). More specifically, the Commission's Recommendation 37 suggested that Congress "enact a statute requiring the producers, retailers or distributors of sexually explicit visual depictions to maintain records containing consent forms and proof of performers' ages." *Final Report of the Attorney General's Commission on Pornography* 138 (1986). The Commission recommended such legislation to deal with "pseudo child pornography," which "involve[s] women allegedly over the age of eighteen who are presented in such a way as to make them appear to be children or youths." *Id.* at 138 n.459 (internal quotation marks and citation omitted). According to the Commission, pseudo child pornography created special concerns because it was difficult and sometimes impossible for law-enforcement officials to discern whether the performers were above the age of eighteen or actually were minors. The Commission recommended imposing age-verification and record-keeping requirements as a means to ensure that no minors were being exploited in actual child pornography that was passed off as pseudo child pornography. *Id.* at 140. A regulation modeled along the lines that Connection suggests would achieve this goal. Consequently, it is difficult to see why a universal age-verification requirement is beneficial. Because the goal of curbing child pornography would not "be achieved less effectively absent the regulation" of performers who are clearly adults, § 2257 is not narrowly tailored. *Ward*, 491 U.S. at 799 (quoting *Albertini*, 472 U.S. at 689).

The majority counters that such a regime would not eliminate the need for subjective determinations of age, which the majority argues would be made by producers untrained in age-verification. Majority Op. at 11-12. The majority does not explain, however, how Congress's goals are advanced by total elimination of subjective determinations of age for middle-aged performers, when Congress actually is concerned with subjective determinations of age for only young-looking performers. How is this goal helped by a regime under which fifty-year-old individuals are required to submit

photo identification before publishing a sexually explicit image of themselves? As the majority points out, subjective age determinations may be harder to make when the photo does not include the performer's face, as in some of the advertisements in Connection's magazines. *Id*. at 11-12. If this is the case, Congress could simply require photo identification when the performer's face is not included in the image. The majority also is concerned that such a rule would leave the initial age determination up to the publishers themselves, who may not be trained in age determination. *Id*. at 12. But it is these publishers who will be punished if their determinations are incorrect, so that the ultimate enforcer will be the government. Regardless, these arguments are not aimed at the ultimate constitutionality of a universal age-verification requirement. Instead, they are arguments better addressed to a legislature attempting to draft a statute that would survive constitutional muster. It is not our place judicially to revise § 2257 or to tell Congress how to do so. Instead, I merely reiterate that § 2257 burdens substantially more protected speech than is necessary to advance Congress's compelling interest in preventing the sexual exploitation of minors. Accordingly, § 2257 is not narrowly tailored and is, therefore, unconstitutional as applied to Connection and the Does.

Protection of children is a government interest of the highest order. Nonetheless, under the applicable precedent, the means that Congress chooses to advance this end must not burden substantially more speech than necessary. For the reasons stated in this opinion, § 2257 is unconstitutional as applied to Connection and the Does. Moreover, I agree with Judge Kennedy's dissent that § 2257 is facially unconstitutional for overbreadth.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting. I join in Judge Kennedy's dissenting opinion which argues that 18 U.S.C. § 2257 is facially overbroad and unduly threatens constitutionally protected speech. I write separately only to indicate why I believe that some of the reasoning employed by this Court in its 1998 opinion pertaining to this case, which addressed an as-applied challenge to the statute, is no longer controlling.

In 1998, I authored the opinion for this Court in *Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ("*Connection I*"). At that time, we addressed the likely merits of Connection's as-applied challenge, and were not presented with a facial challenge to the statute. We affirmed the district court's decision to deny Connection a preliminary injunction because we believed that Connection was unlikely to succeed on the merits of its as-applied challenge. My present position in rejecting the amended statute as facially unconstitutional may appear at odds with the views expressed in *Connection I*, where I found the statute constitutional, as applied. However, based on the record that has developed since *Connection I* as well as an amendment to the statute since enacted, Connection's as-applied challenge now has greater merit than it once did.

The statutory scheme at issue requires individuals depicted in "actual sexually explicit" images, such as Connection's advertisers, to provide government-issued photo identification verifying their age to producers such as Connection. 18 U.S.C. § 2257(b)(1); 28 C.F.R. § 75.2(a)(1). The producer must photocopy the identification, record any aliases the person has used in the past, record where the image is published if it is published on the Internet, and file this information in separately maintained records. 18 U.S.C. § 2257(b); 28 C.F.R. § 75.2(a), (e). These records are then subject to inspection by the attorney general every four months, or more frequently if there is "a reasonable suspicion to believe that a violation . . . has occurred[.]" 18 U.S.C. § 2257(c); 28 C.F.R. § 75.5(d). In 2003, Congress amended the statute to allow the government to use evidence obtained from the records to prosecute crimes other than

record-keeping violations, including child pornography, sexual exploitation of children, and obscenity. 18 U.S.C. § 2257(d)(2); *see* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act, Pub. L. No. 108-21, § 511(a), 117 Stat. 650, 684 (2003). Congress also increased the penalties for violations of the record-keeping provisions, which may now be charged as felonies punishable up to five years in prison, or up to ten years for a second offense. § 2257(i); 117 Stat. at 685.

In *Connection I*, we determined that the statute's record-keeping requirement is content-neutral because "the Act is not directed at protected speech but rather unprotected conduct–namely, child pornography–that may be identified by speech." 154 F.3d at 291. Intermediate scrutiny applies to such content-neutral regulations that impose an incidental burden on speech. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). To survive intermediate scrutiny, the regulation must be "narrowly tailored to serve a significant governmental interest," and must "leave open ample alternatives for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The government bears the burden of proving that its regulation meets this standard. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000).

In *Connection I*, we denied a preliminary injunction based on Connection's as-applied challenge to the statute because we found that "the [record-keeping] provisions of [§ 2257] do not prohibit the sexually explicit speech at issue or unduly burden the opportunity of Connection and its readers to engage in the expression." 154 F.3d at 292. We also found that Connection did not demonstrate that the age reporting requirement chilled constitutionally protected expression because Connection's proof was based largely on "anecdotal evidence and supposition." *Id.* at 292-93. Connection argued that the greatest likelihood of a chilling effect would come from the fear on the part of Connection's advertisers that their identifying information would be unlawfully leaked to the public; we believed such a fear to be unfounded and unduly speculative. *See id.* at 294. We did not believe Connection had made a showing that the statute would compel advertisers to stop advertising simply because they would have to submit photo

identification to the magazine along with their advertisements. Accordingly, we believed that "ample alternative channels" to advertise remained open. *Id.* at 293-94.

Connection no longer suffers from the same lack of evidence. The record now before this Court includes data showing that between 1991 and 2004, Connection's annual revenue from advertisements fell from $44,634.74 to $8,000.21, while magazine sales revenue fell from $975,872.98 to $385,874.21 during the same period. These numbers support the claims of the two newly added Plaintiffs who assert that they would have advertised in a Connection magazine but for the reporting requirement and the fear of being "outed" as a swinger or being subjected to a government investigation.

More importantly, the statute itself no longer begins and ends with the record-keeping requirement; because of the 2003 amendment, it now includes the threat of criminal prosecution for child pornography, sexual exploitation of children, and obscenity, based on information in the records required by the statute. *See* § 2257(d)(2). The amendment increases the likelihood that a reasonable person would be deterred from the protected activity at issue in this case, and calls into doubt this Court's finding in *Connection I* that the statute's provisions do not "unduly burden the opportunity of Connection and its readers to engage in the expression." 154 F.3d at 292.

Because the statute now explicitly authorizes the government to use the identifying information for the purpose of prosecuting other crimes, the fear of Connection's law-abiding advertisers that they may one day be subject to criminal investigation or prosecution is not unreasonable. To minimize this concern by stating that adult swingers who follow the law have nothing to fear ignores the reality that law-abiding people unfortunately can mistakenly become the targets of criminal prosecutions, with all of the accompanying burdens. The majority opinion therefore misses the point when it concludes that swingers who have already been willing to provide their names and addresses to Connection should not be reluctant to do so simply because a photo identification is now required as well; the issue is not the added piece of information swingers must provide, but the additional use to which that information may be put that the statute now sanctions. Further, it is not necessarily inconsistent to

value anonymity in one form and not another. *See Watchtower Bible & Tract Soc'y of N.Y., Inc., v. Vill. of Stratton*, 536 U.S. 150, 167 (2002) ("The fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity.").

We stated in *Connection I* that "courts must weigh the interests at stake in determining whether a statute impermissibly burdens free speech." 154 F.3d at 292. This kind of analysis is not static in an as-applied case; although the government will always have a significant interest in eradicating and prosecuting cases of child pornography, the nature of the burden imposed by a particular statute may become more evident over time. This is especially true when a court first addresses the issue in the context of a motion for preliminary injunction, where the record has not been fully developed and the court only considers the *likelihood* of future success on the merits. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). Moreover, the fact that the government's interest here is clearly compelling does not obviate this Court's need to continue balancing that interest with the burdens the regulation imposes. *See Watchtower*, 536 U.S. at 167 (requiring balance of interests even while recognizing importance of challenged regulation's aim of crime prevention). Connection's newly presented evidence and the increased possibility of criminal penalties together indicate that for Connection and its advertisers, the statute imposes a very real burden on their protected speech–a burden considerably greater than the record indicated in 1998.

Therefore, while the facial invalidity of the statute may render a final analysis of the as-applied question unnecessary, I have written separately to underscore my reasons for believing that the statute may also fail to survive an as-applied challenge to its constitutionality, notwithstanding this Court's prior ruling in *Connection I*.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting. I join in my dissenting colleagues' discussions of the as-applied challenge, and conclude, as do they, that under intermediate scrutiny the identification/record-keeping requirements of § 2257 impose an unconstitutional burden on plaintiffs' First Amendment rights.

I share the majority's reluctance to invalidate § 2257 in its entirety based on the hypothetical couple who create sexually-explicit depictions in private for their own use, as well as its preference for a resolution that permits § 2257 to operate within its constitutionally permissible reach. I have considered the alternative of simply agreeing that the statute is unconstitutional as applied and finding it unnecessary to address the facial challenge. But, notwithstanding my reluctance to reach the facial challenge, I agree with Judge Kennedy that § 2257's sweep is so broad – even when the substantiality of its overbreadth is assessed relative to its plainly legitimate sweep – and its burdens so potentially chilling of protected speech, that requiring case-by-case challenges to its overbreadth is inconsistent with the Supreme Court's First Amendment jurisprudence.

I do not agree with the majority that "[t]he record and the plaintiffs' concessions establish that the overwhelming majority of applications of § 2257 do not offend the free-speech guarantees of the Constitution." Maj. Op. at 23. Nor do I agree that plaintiffs' challenge amounts to "leveraging a few alleged unconstitutional applications of the statute into a ruling invalidating the law in all of its applications." *Id.* No doubt these differences stem at least in part from our divergent conclusions regarding the merits of plaintiffs' as-applied challenge.

My joining in Judge Kennedy's conclusion that the facial challenge should be upheld is based not only upon the application of § 2257 to the private couple, but also upon its application to plaintiffs and those like them, and to all adults who desire in any fashion to create, share, or disseminate non-obscene, sexually-explicit depictions of

themselves, or other adults, without relinquishing their anonymity.  While the majority correctly observes that we have no proof regarding the number of individuals who would be adversely affected by the application of § 2257, we do know that millions of adults exchange or share personally-produced sexually-explicit depictions.  *See* J.A. at 1007-11 (stipulation of the parties noting the existence of, and incorporating an exhibit listing, over 13 million personal ads containing sexually-explicit text and images on a single website for sex and swinger personal ads, of which those examined showed that over 94% involved adults over 21).

While *Williams* and other cases cited by the majority do, indeed, as the majority stresses, require that a statute's "overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," the majority cites no case where the application of this admonition resulted in the Court's rejecting a facial challenge under circumstances such as those involved here.  *United States v. Williams*, __ U.S. __, 128 S. Ct. 1830, 1838 (2008).  In *Williams*, the Court repeatedly rejected the defendant's proffered unconstitutional applications as either not within the reach of the statute or not involving protected speech.  *Id.* at 1842-44.  Only the *amici*'s hypothetical movie distributor advertising a movie as containing footage of actual children engaging in actual or simulated sex, and the hypothetical documentary showing footage of child rape, arguably fell within both the statute's sweep and the protections of the First Amendment.  *Id.* at 1843-44.  The Court viewed the movie-distributor hypothetical as "implausible" and the documentary hypothetical as adequately protected by an as-applied challenge.  *Id.*  The Court's observation that "[i]n the vast majority of its applications, this statute raises no constitutional problems whatever," *id.* at 1844,  was not made in the context of millions of adults engaging in speech falling both within the statute's sweep and the First Amendment's protection.  Such is the case here.

In *Hicks*, the Court found the substantiality requirement unsatisfied where the challenged regulation applied not just to those seeking to exercise First Amendment rights but also to strollers, loiterers, drug-dealers, roller skaters, and others not engaged in constitutionally-protected conduct.  *Virginia v. Hicks*, 539 U.S. 113, 123 (2003).  The court observed that "[r]arely, if ever, will an overbreadth challenge succeed against a law

or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech." *Id.* at 124. Here, the statute is addressed to conduct that is necessarily associated with speech; all the depictions that are the subject of § 2257 are speech, although those involving minors and those that are obscene are not protected by the First Amendment.

The instant case is, in this respect as in others, similar to *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002). In *Watchtower*, because the regulation affected a substantial amount of political and religious speech in addition to the targeted commercial speech, the Court found it necessary to look to whether the regulation struck an appropriate balance between the affected speech and the government's interest in the prevention of fraud, the prevention of crime, and the protection of residents' privacy. *Id.* at 164-69. In evaluating this balance, the Court did not require statistics comparing the number of commercial canvassers affected to the number of non-commercial canvassers, or empirical data regarding the extent to which the regulation would deter protected speech. *See id.* at 168. The Court was satisfied that the overbreadth was substantial based upon the inclusion of "'Camp Fire Girls,' 'Jehovah's Witnesses,' 'Political Candidates,' 'Trick or Treaters during Halloween Season,' and 'Persons Affiliated with Stratton Church,'" in the list of canvassers to which the ordinance applied. *Id.* at 165. I would similarly conclude that whatever the ratio of sexually-explicit depictions involving persons who appear to be or are minors is to all sexually-explicit depictions, a substantial amount of sexually-explicit depictions involve persons who appear to be and are adults, and a substantial number of adults, like the Doe plaintiffs, will be deterred from sharing sexually-explicit pictures by the identification/record keeping requirements of § 2257.

*Broadrick* does, indeed, give me pause, particularly the Court's admonition that application of the overbreadth doctrine is "strong medicine," and its statement that "[a]lthough such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect – at best a prediction – cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe."

*Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973).  However, in *Broadrick,* the statute's proscriptions were clearly stated and included "a substantial spectrum of conduct that is as manifestly subject to state regulation as the public peace or criminal trespass." *Id.* at 616.  After observing that the statute was constitutional as applied to appellants' conduct, and a long list of other conduct, the Court rejected the argument that because the statute had been interpreted as applying to "such allegedly protected activities as the wearing of political buttons or the use of bumper stickers," *id.* at 618, it should be struck down as unconstitutionally overbroad.  The Court explained "as presently construed, we do not believe that § 818 must be discarded *in toto* because some persons' arguably protected conduct may or may not be caught or chilled by the statute." *Id.*  Here, the argument in favor of overbreadth does not rest upon  "arguably protected conduct that may or not be caught or chilled."  It rests upon clearly protected conduct that, given its nature and the intrusiveness of the identification/record keeping requirement, is likely to be chilled.

As to the remedy, it appears all agree that the statute does not provide guidance as to how Congress would limit its reach.  Maj. Op. at 20-21, 26; Dis. Op. at 52-53 (Kennedy, J.).  Thus, it is not susceptible to a limiting construction without entering into Congress' policy-making domain.  The possibility of enjoining the unconstitutional applications of the law while preserving the other valid applications of the law is identified as a theoretical option by the majority, but is not the path chosen by it.  Maj. Op. at 26.  It seems, then, that all agree that this too is not a viable option.  Dis. Op. at 52-53.  The majority opts to "assume for the sake of argument that certain applications of the law would be unconstitutional but still reject a facial challenge."  Maj. Op. at 26.  The cases cited in support of this path are substantial overbreadth cases.  *Hicks*, *supra*, 539 U.S. 113; *N.Y. Club Ass'n v. City of N.Y.*, 489 U.S. 1, 14 (1988) ("[W]e cannot conclude that the Law threatens to undermine the associational or expressive purposes of any club, let alone a substantial number of them."); *N.Y. v. Ferber*, 458 U.S. 747, 773 (1982) ("[W]e seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fraction of the

materials within the statute's reach."); *Broadrick*, *supra*, 413 U.S. 601. For the reasons stated, these cases do not support the majority's path.

Lastly, I do not regard the majority opinion as foreclosing the litigation posited by Judge Kennedy.